877 F.2d 1214
 1990 A.M.C. 2257
 TEXAS EASTERN TRANSMISSION CORPORATION, Plaintiff,
v.
McMoRAN OFFSHORE EXPLORATION CO., et al., Defendants.
In the Matter of the Complaint of TRACTUG ASSOCIATES and
Faustug Marine Corporation for Exoneration From or
Limitation of Liability as Owners of the ZP Chalone, ZP
Caymus and ZP Condon, and ODECO, Inc., Plaintiffs-Appellees.
MARATHON OIL CO., et al., Plaintiffs-Appellants,
v.
McMoRAN OFFSHORE EXPLORATION CO., Defendant, Faustug Marine
Corp., et al., Defendants-Appellees.
TEXAS EASTERN TRANSMISSION CORPORATION, Plaintiff-Appellee,
v.
McMoRAN OFFSHORE EXPLORATION CO., Defendants.
and
FAUSTUG MARINE CORP., Ocean Drilling & Exploration Co.,
Continental Insurance Company and Tractug
Associates, Defendants,
v.
JOHN E. CHANCE & ASSOCIATES, INC., Defendant-Appellant.
In the Matter of the Complaint of TRACTUG ASSOCIATES and
Faustug Marine Corporation for Exoneration From or
Limitation of Liability as Owners of the ZP Chalone, ZP
Caymus and ZP Condon, and ODECO, Inc., Plaintiffs-Appellees,
MARATHON OIL CO., et al., Plaintiffs-Appellants,
v.
McMoRAN OFFSHORE EXPLORATION CO., et al., Defendants-Appellee.
CONTINENTAL INSURANCE COMPANY, Defendant-Appellant,
v.
McMoRAN OFFSHORE EXPLORATION CO., et al., Defendants-Appellees.
 Nos. 87-3509, 87-3879.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 3, 1989.
Order Modifying Opinion and
Denying Rehearing and
Rehearing En Banc April 24, 1989.
 Order Denying Rehearing and
Rehearing En Banc May 26, 1989.
 
 James G. Burke, Jr., Daniel E. Knowles, III, Burke & Mayer, New Orleans, La., Sandra L. Magerfleisch, Houston, Tex., for Marathon Oil Co., et al.
 Mat M. Gray, New Orleans, La., for La. Land.
 Scott R. Wheaton, Jr., Charles E. Lugenbuhl, Lugenbuhl, Burke, Wheaton, Peck & Rankin, New Orleans, La., for John E. Chancel.
 James M. Tompkins, New Orleans, La., for INA.
 Maurice C. Hebert, Jr., John F. Young, Jr., John M. Ribarits, Hebert, Mouledoux & Bland, New Orleans, La., for Ocean Drilling & Exploration Co.
 Gary A. Hemphill, Andrew T. Martinez, Terriberry, Carroll & Yancey, New Orleans, La., for Faustug Marine Corp. & Tractug Ass'n.
 Machale A. Miller, O'Neil, Eichin & Miller, New Orleans, La., for Continental Ins.
 Scott E. Silbert, Metairie, La., for Fidelity & Cas. Co. of N.Y. et al.
 Robert M. Contois, Jr., Robert T. Lemon, II, New Orleans, La., for McMoRan Offshore Exploration Co.
 Ronald A. Johnson, New Orleans, La., for Underwriters at Lloyd's (P & I and John Chances.)
 Robert P. McCleskey, Jr., New Orleans, La., for United States Fire Ins. Co.
 Allen F. Campbell, New Orleans, La., for Arthur Levy.
 Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Texas Eastern Transmission Corp.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before RUBIN, GARZA, and KING, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 An underwater pipeline was damaged during the relocation of a drilling rig in the Gulf of Mexico, resulting in a multitude of disputes, including: the apportionment of fault among the parties that participated in the relocation; what party or parties were due compensation for the property damaged; and the extent to which several parties purportedly indemnified one another. We affirm the judgment of the district court in all but the last of these determinations.
 
 I.
 
 2
 A winter storm disrupted the process of relocating the drilling rig at a specific location in the waters of the Gulf of Mexico on the night of December 31, 1982. The record discloses the events surrounding this disruption and subsequent accident. The Pennzoil Exploration Production Company had leased to McMoRan Offshore Exploration Company Block 107 West Delta Area off the coast of southeast Louisiana, retaining a 34% ownership interest in the proceeds derived from the production of gas from the lease. To help McMoRan drill and draw gas from wells in Block 107, Pennzoil assigned to McMoRan the D/B OCEAN TRAVELER, a semisubmersible drilling rig leased by Pennzoil but owned and operated by ODECO.
 
 
 3
 The D/B OCEAN TRAVELER was situated in Block 316 Eugene Island Area. Since the rig possessed no locomotive capabilities, navigational tools, or weather instruments, Pennzoil and McMoRan retained several specialized vessels to perform these functions and move the drilling rig onto Block 107: Pennzoil procured the services of three tug boats owned by Tractug Associates and operated by Faustug Marine Corporation (the ZP Caymus, ZP Challone, and ZP Condon), and McMoRan hired a survey boat owned by John E. Chance & Associates, Inc. (the M/V Atlantic Surveyor) and an anchor boat owned by Arthur Levy (the M/V Mustang Island). The tug boats were responsible for towing the drilling rig onto location; the survey boat was to stabilize the rig over the drill site and deploy various buoys at and near the well site to indicate to the rig the well area and anchor pattern; and the anchor boat was to raise and rack the anchors at Block 316 and set them at Block 107. ODECO employees--engineer Terrebone, toolpusher Trahan, and superintendent Stogner--were aboard the D/B OCEAN TRAVELER throughout the relocation process. In addition to relying on these specialized vessels and ODECO personnel aboard the rig, McMoRan stationed its company representative, Bobby Craft, on board the D/B OCEAN TRAVELER. Craft had the ultimate authority to suspend or terminate any activities of the rig or associated vessels conducted in an unsafe manner.
 
 
 4
 On the morning of December 28, 1982, the rig's anchors were lifted out of the seabed in Block 316, and early on the morning of the 29th, the rig began its trip to Block 107. On December 30, Chance's survey boat departed Fourchon, Louisiana for the proposed location in Block 107. By 11 p.m., the crew had dropped off three instrument men at three fixed platforms surrounding the location to fix the points at which various location and anchor marker buoys were to be set.
 
 
 5
 At 5 p.m. on December 31, the rig began its usual procedures for moving onto location: the tug boats paused approximately three miles from the proposed location in Block 107 to shorten their tow lines from 1700 feet to approximately 850 feet, and Terrebone requested Chance's survey vessel and Levy's anchor boat to stand by the markers for the Nos. 6 and 7 anchors respectively. Once the survey boat had properly placed these markers, the rig could be towed between these two gate buoys until the bow of the rig reached the reference buoy in the middle of the area. It is customary practice to drop the Nos. 6 and 7 anchors, the rig's two stern anchors, as the rig passes through the gate buoys in order to slow the rig's progress and bring it to its final location. The rig is then held on location by the tugs until the anchor boat sets out the remaining six anchors in a designated pattern and resets the Nos. 6 and 7 anchors in their appropriate positions.
 
 
 6
 The D/B OCEAN TRAVELER entered the gate buoys on December 31, and dropped its Nos. 6 and 7 anchors at 9 p.m., releasing approximately 1750 feet of chain to the No. 6 anchor off the starboard stern and 1100 feet of chain to the No. 7 anchor off the port stern. After releasing these anchors, however, the anchor boat informed the rig that it could not continue operations because severe weather obscured the location flags that had been set out by Chance and prevented it from placing the rig's anchors in their specified locations.
 
 
 7
 After the anchor handling operation had been discontinued, Terrebone, ODECO's engineer aboard the rig, asked the tug boats if they could hold the rig steady facing 90 degrees due east into the wind. Faustug responded affirmatively. Throughout the night of December 31, Terrebone repeated this question to the tugs, offering to drop the Nos. 2 and 3 anchors to help hold the rig in position. Faustug declined, assuring Terrebone each time that it could maintain the rig's position facing 90 degrees due east into the wind. Moreover, every two hours during the night, the control room operator aboard the rig contacted the lead tug to monitor the position of the rig, and was continually informed that the rig was being held in position.
 
 
 8
 At 9:30 p.m. on December 31, Terrebone asked the Chance survey boat for a "position shot" to determine the location of the rig, but the survey boat responded that its auto-tape instrument was inoperable, and that the survey boat could not, therefore, inform the rig of its precise location. Three and a half hours later, the survey boat received an operable set of auto-tapes, but neither informed Terrebonne of their arrival nor used them to determine the position of the rig.
 
 
 9
 At 1:40 on the morning of January 1, the tow line of the Z/P Caymus parted at the bulwark of the rig, where the chafing gear is normally placed to prevent such an occurrence. Terrebone then asked the tugs whether the rig could still be held on location without dropping its bow anchors. Faustug stated again that it needed no aid from the rig to hold it on location. At 4:30 a.m., the Z/P Caymus gave its mooring line to the anchor boat so the anchor boat could assist in holding the rig in place.
 
 
 10
 At 5:00 a.m., Terrebone recorded in the rig's log book that the rig was "[h]olding ... 90 degrees into the wind and sea. Survey boat said in area of loc[ation]." A half hour later, Craft, McMoRan's representative, told and ODECO employee to ask the survey boat to determine the location of the rig. Sometime between 5:30 and 7:45 a.m. on January 1, the Chance survey boat informed Terrebone that the rig was three to four miles west of location. Both ODECO personnel and Craft found it hard to believe that the rig had moved during the night, and suspected that Chance had placed it in the wrong block the previous night.
 
 
 11
 At 7:45 on the morning of January 1, aware that the rig was not on location, ODECO personnel began to retrieve the No. 7 anchor, completing this operation within four hours. Around noon, Terrebone asked the anchor boat to "chase out" the No. 6 anchor because its buoy had disappeared, but the anchor boat refused; the anchor had sunk into the Gulf, and the anchor boat might be damaged if it ran over the buoy. Consequently, with the aid of the tug and anchor boats, the rig "walked back" toward the No. 6 anchor until it was right over the anchor. The rig then used its windlass to attempt to raise the No. 6 anchor, but it could not raise the anchor from the ocean floor. Even when exerting its maximum power of 600 amps, the windlass would overheat and shut down automatically without unseating the anchor.
 
 
 12
 Between 3:00 and 4:00 p.m. on January 1, Craft halted the retrieval of anchor No. 6 to determine if any pipelines were in the area. At Craft's request, Terrebone radioed the survey boat and asked it to determine the rig's position. When Chance replied that it could not make such a determination because of poor visibility, one of the tugs interrupted the radio transmission and informed the rig that it was located in the southwest corner of Block 106 West Delta Area. A quarter of an hour later, Craft called Chance again to ask if Chance knew of any pipelines in the area. Chance's party chief, Glenn Miller, asserted that he had no knowledge of any lines, but within the next hour, informed the rig that a pipeline was located 500 feet west of the Block 105/106 border.
 
 
 13
 Thinking that the rig was in the southwest corner of Block 106, and knowing both that a pipeline ran 500 feet west of the Block 105/106 border and that the No. 6 anchor had approximately 600 feet of chain out, Craft met with ODECO personnel--Terrebone, Trahan, and Stogner--to discuss the possibility that the anchor was hooked on a pipeline. ODECO personnel informed Craft that they had previously experienced similar difficulties retrieving anchors in this area because the Gulf bottom is composed of silt and "gumbo", permitting deep anchor penetration. After discussion, the group agreed to recommence retrieval of the anchor.
 
 
 14
 At approximately 5:30 p.m. on January 1, after retrieval efforts had resumed, a large black mushroom cloud erupted from the water approximately 1000 to 2000 feet off the starboard stern of the rig; the No. 6 anchor had ruptured a 20-inch natural gas pipeline owned by the Texas Eastern Transmission Corporation (TETCO). Subsequent sonar scans revealed that this 20-inch pipeline had been displaced only 50 feet, indicating that the No. 6 anchor may not have been hooked on it during the entirety of the retrieval process.
 
 
 15
 At 6:00 p.m., the No. 6 anchor was cut with approximately 400-500 feet of line still out. The tug boats then began to tow the rig east to its proper location in Block 107, and the survey boat gave the final "shot" or "tie-in" at approximately 1:00 a.m. on January 5, 1983.
 
 II.
 
 16
 The 20-inch pipeline ruptured by the rig's No. 6 anchor extends from Block 89 South Pass across the seabed of the Gulf of Mexico through Block 105 West Delta Area to Venice Station in southeast Louisiana. It was built by TETCO in 1981 as a result of Marathon Oil Company's exploration and discovery of gas in South Pass 89. In its application to the Federal Energy Regulatory Commission for approval to build the pipeline, TETCO stated that its proposed pipeline would not only provide access to Marathon's "committed reserves in South Pass Block 89," but also to "areas adjacent to the proposed pipeline route as they become available." To fulfill this goal, TETCO constructed several "tie-in" points along the pipeline so it could transport gas produced by other companies.
 
 
 17
 At platform A in South Pass 89, Marathon processes, separates, and delivers natural gas and liquid hydrocarbons through a six-inch pipeline to platform 89B. At platform 89B, the gas and liquid hydrocarbons are separated, and the gas is processed, cleaned, scrubbed, compressed, cooled, and delivered into the 20-inch TETCO pipeline. High pressure gas recovered from the well heads in South Pass 89B is reduced in pressure, separated, processed, cleaned, and delivered directly into TETCO's 20-inch pipeline. Low pressure gas from South Pass 89B is also compressed and cooled, and then entered into the 20-inch pipeline.
 
 
 18
 Marathon leases to TETCO portions of platform 89B on which TETCO has placed meter skids to measure the amount of gas that passes into the 20-inch pipeline. As the gas passes through the meter, ownership of the gas vests in TETCO according to the gas-purchase agreement between Marathon and TETCO. Although TETCO built and owns the meter skids, Marathon maintains them under a separate maintenance contract, in addition to maintaining the pilot valves on the meters that measure gas pressure. These pilot valves are attached to TETCO's 20-inch pipeline on both platforms A and B, and are part of Marathon's emergency shutdown system.
 
 
 19
 The gas is transported 47 miles in the 20-inch pipeline from platform 89B to shore. On shore, TETCO uses a slug catcher to collect the liquid hydrocarbons, water condensate, and hydrates. This slug catcher connects to flow lines, owned and operated by Marathon, which sequester the liquids into an oil tank for allocation to Marathon. From the slug catcher, the gas flows through two dehydrators, owned and operated by Marathon, and onto distillation facilities at the Warren gas plant where liquifiable hydrocarbons, belonging to Marathon, are removed from the gas. The gas is then metered, analyzed, and returned into TETCO's 20-inch pipeline at the rear of the Warren plant. Marathon paid for 880 feet of the 20-inch pipeline at the integrated delivery system at the Warren plant, although neither Marathon nor TETCO can identify precisely for which section Marathon paid. The gas is subsequently delivered to TETCO's 36-inch transmission line, and transported 50 miles to TETCO's compression station at LaRose, Louisiana.
 
 
 20
 The No. 6 anchor of the D/B OCEAN TRAVELER ruptured the 20-inch pipeline between Marathon's platform at South Pass 89B and TETCO's slug catcher on shore. Thirty million cubic feet of natural gas, together with its liquids and liquifiable hydrocarbons, erupted from the delivery system at the time of the break. Marathon's pilot valves immediately detected a loss of pressure, communicated this information to various control panels, closed off the wells, and terminated production aboard platforms 89A and B. Marathon later resumed production at South Pass 89A and B through its own modified 12-inch pipeline.
 
 III.
 
 21
 The rupture of the 20-inch pipeline sparked an explosion of litigation: TETCO sued McMoRan, Faustug, Faustug's insurer (Continental Insurance Company), ODECO, Chance, and Arthur Levy for damages to its 20-inch pipeline; Marathon sued McMoRan, Faustug, and ODECO for loss of production resulting from the rupture of TETCO's 20-inch pipeline; McMoRan claims Faustug, or Faustug's insurer, Continental, indemnified it; and ODECO claims McMoRan indemnified it, and that it is entitled to costs and attorney's fees. Prior to trial, TETCO settled its claim against ODECO, Faustug, and Continental for $9.5 million, assigning to these companies its remaining rights against McMoRan, Chance, and Arthur Levy.
 
 
 22
 After hearing argument, the district court (1) apportioned fault between the various parties; (2) denied Marathon's claim for loss of production; (3) denied McMoRan's claim that Faustug or Continental indemnified it; and (4) denied ODECO's claim that McMoRan indemnified it and ODECO's request for costs and attorney's fees.
 
 IV.
 A. Apportionment of Fault
 
 23
 The district court held Faustug, ODECO, McMoRan, and Chance at fault for rupturing TETCO's 20-inch pipeline because each was "in a position to prevent the accident had one of them exercised requisite reasonable care."
 
 
 24
 Faustug was negligent, the district court found, because it continually and erroneously reassured Terrebone and the control-room operator that the tug boats needed no assistance to hold the rig on a 90 degree heading in the area of location. The court also premised Faustug's negligence upon its finding that the tugs were unseaworthy: they did not have a properly functioning LORAN-C unit, which could have plotted the location of the rig throughout the night of December 31, and one tug's chafing gear was not in the proper location on the towline that parted.
 
 
 25
 ODECO personnel were negligent, the district court found, by advising Craft, before they had determined whether anchor No. 6 was hooked on a pipeline or other underwater obstruction, that difficulty in retrieval was common in the West Delta area. ODECO personnel advised Craft to continue retrieval despite their knowledge that the rig was in the southwest corner of Block 106, a pipeline existed 500 feet inside the Block 105/106 border, and the No. 6 anchor had approximately 600 feet of chain out.
 
 
 26
 McMoRan acted negligently, the district court found, when Bobby Craft, McMoRan's representative aboard the D/B OCEAN TRAVELER, recommenced the retrieval of anchor No. 6 after he had first shut it down, knowing, like ODECO personnel, the location of the rig, the existence of a nearby pipeline, and the amount of anchor line still out.
 
 
 27
 Chance was negligent, the district court found, because once the rig was moved onto location, Chance had a duty to ensure that the rig was positioned on location over the intended drilling site. The court held that Chance breached this duty because its personnel on the drilling platforms and survey boat remained silent when they observed the westward movement of the rig out of sight during the night of December 31. Had Chance spoken up when it first saw the rig drifting, the rig could have dropped its bow anchors to prevent further movement.
 
 
 28
 After finding these parties negligent, the district court assigned a percentage of fault to each:
 
 
 29
 Faustug 70%
ODECO 10%
McMoRan 10%
Chance 10%
Levy 0%
 
 
 30
 McMoRan, Chance, and Faustug each challenge the district court's apportionment of fault, contending that others were more reprehensible.
 
 
 31
 As a preliminary matter, we find that the district court used the correct method--a system of "proportional fault"--for allocating responsibility. When the negligent conduct of each party "contribute[s] to the loss, complete apportionment between the negligent parties, based on their respective degrees of fault, is the proper method for calculating and awarding damages in maritime cases."[1]
 
 1. McMoRan
 
 32
 McMoRan challenges the district court's assignment to it of 10% liability, contending that Craft, its company man aboard the D/B OCEAN TRAVELER, acted reasonably by intervening to stop retrieval of anchor No. 6 when it appeared dangerous, and then asking ODECO personnel and Chance for relevant information. In particular, McMoRan asserts that this court's decision in Wallace v. Oceaneering International[2] supports its freedom from fault: Craft had primary responsibility only over drilling operations, and had no operational control over ODECO, who was responsible for moving the rig onto location.
 
 
 33
 Craft undoubtedly exercised good judgment when he suspended anchor-retrieval operations between 3:00 and 4:00 p.m. on January 1, and sought additional information from Chance and conferred with ODECO personnel. Faustug informed Craft that the rig was somewhere in the southwest corner of Block 106, Chance revealed that a pipeline ran 500 feet over the Block 105/106 boundary, and Craft knew already that the rig had 600 feet of anchor line still out.
 
 
 34
 With this information, Craft ordered retrieval of the No. 6 anchor to continue. This information provided an insufficient basis, however, upon which to resume retrieval; it gave Craft a margin of error of only 100 feet. Missing a critical piece of information--the precise location of the rig in the southwest corner of Block 106, Craft should have been aware that there was a very real possibility that the No. 6 anchor was hooked on a pipeline in Block 105. Prudence dictated that Craft stay the retrieval of the anchor until he had discovered the precise location of the rig in the southwest corner of Block 106. Slattery, McMoRan's on-shore drilling engineer, underscored Craft's negligence when he testified that he takes precautionary measures whenever pipelines are within 1,000 feet of a rig's location.
 
 
 35
 McMoRan's second argument, that Craft did not have operational control over the retrieval process and cannot, therefore, be held liable as a matter of law, seeks to equate the role of Craft to that of the company man in Wallace v. Oceaneering International. In Wallace, we held that an offshore well owner, represented by his company man aboard a semisubmersible drilling rig, was not liable for injuries caused by a negligent independent drilling and diving contractor, despite the fact that the "company man" aboard the rig "monitored the progress of the work" and could halt the diving and drilling "if he observed an obviously dangerous situation."[3]
 
 
 36
 While Wallace enunciated the relationship between a company man and the independent contractor he monitors, the court found two facts dispositive of the company's liability: (1) the company man "had no actual control over or responsibility for the details of the drilling and diving work, but merely inspected the progress," and (2) "there was no evidence that [t]he [company man] had been aware" of the actual circumstances of the accident.[4]
 
 
 37
 McMoRan's Offshore Drilling Contract assigns ODECO responsibility for moving the rig onto location, and provides in Article III that the "Operator [McMoRan] shall have no direction or control of Contractor [ODECO], ... Operator being interested only in the results to be obtained." The contract, as the district court assumed, gave Craft, as a company man, "no operational control" over the independent contractor. Despite this contractual limitation, however, Craft intervened in the operation and halted retrieval of the No. 6 anchor. After that intervention, Craft had the ultimate authority over the moving process; Terrebone awaited his orders and only he could direct the crew to recommence retrieval of the No. 6 anchor. Craft's subsequent decision to resume retrieval was taken, therefore, while he had actual operational control over the work of the independent contractor.
 
 
 38
 Moreover, McMoRan has failed to demonstrate that Craft was ignorant of the circumstances that led up to the accident. Unlike the company man in Wallace who possessed no knowledge of surrounding circumstances and took no actions, Craft had as much information as anyone concerning the positions of the rig, anchor line, and pipelines; his initial intervention and solicitation of information indicates his awareness. Once Craft had halted retrieval for safety reasons, his premature order to resume retrieval absent the necessary information establishes his negligence.
 
 2. Chance
 
 39
 Chance does not contest the district court's finding that Chance personnel witnessed the rig drifting during the storm; instead, it challenges the district court's assessment of 10% liability on the ground that it had no legal duty to inform the rig that it was drifting. As surveyor, Chance contends that its responsibility was limited to standing on location and acting as a reference point; it was not obliged to inform the rig that it had drifted three and a half miles off location. Alternatively, Chance argues that even if it had such a duty, its failure to warn was not the proximate cause of the accident.
 
 
 40
 Chance performed survey work for McMoRan by oral agreement. Without a written contract delineating Chance's obligations, we cannot determine the precise scope of Chance's surveying responsibilities.[5] Looking to the customary practice of the maritime industry or the expectations of participants does not help Chance's argument, given that Craft asked Chance twice to determine the location of the rig (once at 9:30 p.m. on December 31, and again between 3:00 and 4:00 p.m. on January 1), and once, late in the afternoon on January 1, to determine if any pipelines lay near the rig. These repeated queries suggest that "those aboard the rig ... expect[ed] the surveyor to [help] 'direct' the rig onto location."[6]
 
 
 41
 Even were we, in reliance on custom or expectations, to restrict Chance's obligations to within one mile of location, Chance would be exonerated from liability only for the information its party chief provided Terrebone late in the afternoon on January 1 when asked if any pipelines were buried beneath the waters around the rig. The geographical limitation does not excuse Chance personnel, however, from informing the rig that it had drifted off location after it had been placed on location and had dropped several anchors. Chance knew that the rig was in the process of moving onto location on December 31 and had dropped its Nos. 6 and 7 anchors. Once these anchors were dropped, Chance had a duty to apprise the rig of its knowledge that the rig was drifting off location during the inclement weather. If Chance had conveyed this information to the rig when it first saw the rig drifting on the night of the storm, rather than waiting until 5:30 a.m. on January 1, the rig could have dropped additional anchors, and prevented further movement. Timely warning might have prevented the sequence of events that resulted in damage to TETCO's 20-inch pipeline. The contribution of intervening causes does not, of course, eliminate Chance's proportional fault.[7]
 
 3. Faustug
 
 42
 Faustug contends that the district court should not have found it seven times more liable than Chance since Faustug and Chance committed the same error--failing to warn the rig that it was moving during the night of the storm. Faustug and Chance, Faustug argues, should bear the same proportion of fault.
 
 
 43
 The district court did not, however, hold Faustug and Chance liable for the same negligent conduct. Chance's error lay in its silence until 5:30 a.m. on January 1; Faustug's negligence lay in its repeated, specific assurances that it was holding the rig in position, its failure to have a LORAN-C navigational unit on board its tug boats, and its improper use of its chafing gear.
 
 
 44
 Moreover, even if Faustug's negligent conduct were considered equivalent to Chance's actions, the liability imposed upon each party is calculated not only according to each party's conduct, but according to the job each had and the duty each owed. Whatever obligations Chance incurred as surveyor, they were cumulatively less than the primary responsibility Faustug bore for guiding the rig safely to Block 107 and, more specifically, for assuring that the rig remain in place during the night of the storm. This disparity in task and duty makes Faustug's parity thesis untenable.
 
 
 45
 Aside from Faustug's contention that its fault was comparable to Chance's negligence, no party challenges the district court's implicit holding that Faustug was responsible, more than any other party, for assuring safe passage for the rig, and, in particular, for holding the rig in place overnight. We see no reason to alter the district court's allocation of 70% of the fault to Faustug, and 10% to Odeco, McMoRan, and Chance, respectively. We review such a determination under the clearly erroneous standard,[8] giving deference to the district court's decision, since the allocation of proportionate fault is, at best, a judgment call not susceptible to precise measurement. The district court's distribution of fault accords with the degree to which each party was negligent and the extent to which this negligence caused the rupture of Tetco's 20-inch pipeline.
 
 B. Marathon's Claim for Loss of Production
 
 46
 The district court dismissed Marathon's claim for loss of production under Fed.R.Civ.P. 41(b), holding that Marathon had no "proprietary interest" in the damaged property, as required by Robins Dry Dock & Repair Co. v. Flint[9] and State of Louisiana ex rel. Guste v. M/V Testbank.[10] Marathon appeals, claiming a proprietary interest in the 20-inch pipeline on the basis that (1) it exercised functional ownership over the 20-inch pipeline, (2) it had functional control and possession over the pipeline, and (3) its platforms and pipeline facilities and the 20-inch pipeline functioned as a permanent and complete integrated unit. Marathon makes no claim for the loss of gas or other derivative products in the pipeline at the time of the accident.
 
 
 47
 Marathon contracted with TETCO for use of TETCO's 20-inch pipeline, and no one doubts that the damage to the pipeline adversely affected Marathon's exercise of its contractual rights. In such circumstances, however, this circuit, guided by the Supreme Court, has been unwilling to permit the contracting party to sue the injuring party for tortious conduct without demonstrating a "proprietary interest" in the damaged property.[11] Justice Holmes provided the rationale in Robins:
 
 
 48
 The injury ... was no wrong to the [contracting party] but only to those to whom [the damaged property] belonged.... [A] tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong.... The law does not spread its protection so far.[12]
 
 
 49
 In Testbank, this circuit underscored the significance of Robins as "a pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability;" the requirement that a party show a "proprietary interest" forestalls the "wave upon wave" of litigation based upon the "successive economic consequences" of a "disaster inflicting large and reverberating injuries."[13] Thus, Robins and Testbank preclude a party whose rights derive from a contractual, business arrangement from suing in tort a party with whom it has no such relationship if it cannot show the requisite level of interest in the damaged property itself.
 
 
 50
 Marathon concedes that, except for an insignificant, unidentifiable stretch of pipe at the Warren plant, it does not actually own any of TETCO's 20-inch pipeline. Instead, Marathon attempts to circumvent Robins' ownership requirement by demonstrating that it had the requisite "proprietary interest" in the pipeline.
 
 
 51
 Marathon contends that this court's opinion in J. Ray McDermott & Co. v. S.S. Egero[14] provides support for the conclusion that it exercised functional control over the 20-inch pipeline. In that case, we held that the builder of a pipe " 'owne[d]' " and could recover for a pipe damaged during construction.[15] Even if we ignore the diminished importance of S.S. Egero in the context of the circuit's more recent and thorough examination of "proprietary interest" in Testbank, the facial applicability of S.S. Egero to Marathon's claim is tenuous: Marathon was not in the process of constructing a pipeline when the damage occurred; instead, the pipeline, which was actually owned by TETCO, was already constructed and operating. Since S.S. Egero stands only for the proposition that a builder under contract is the owner of what it is building until it receives payment and transfers actual title, it does not support Marathon's claim that the oil company was the functional owner of the 20-inch pipeline.
 
 
 52
 Marathon claims alternatively that it exercised "functional control and possession" over the 20-inch pipeline. To support this claim, Marathon adverts to this court's opinion in Louisville & Nashville R. Co. v. M/V Bayou Lacombe,[16] in which we held that the Louisville & Nashville Railroad did not have a proprietary interest in a damaged bridge which it used under contract from Southern Railway: Louisville & Nashville "never had possession or control of [the] property, ... [t]he bridge [wa]s maintained entirely by Southern's employees[, and] Louisville & Nashville ha[d] no obligation to repair the bridge or contribute to the cost of repairs ..."[17]
 
 
 53
 Bayou Lacombe employed three criteria to evaluate proprietary interest: actual possession or control, responsibility for repair, and responsibility for maintenance. Marathon does not contend that it actually possessed or controlled the property: it did not possess the exclusive right to use the 20-inch pipeline, and it could not control how TETCO used it. Nor did Marathon have any responsibility to perform repairs on the 20-inch pipeline when it was damaged. Marathon is, therefore, compelled to rely upon its maintenance of a portion of Tetco's property to distinguish itself from the railroad in Bayou Lacombe.
 
 
 54
 Marathon did maintain various appurtenances to the 20-inch pipeline, including the meter skids, pilot valves, pumps, processing equipment, compressors, vent lines, flare lines, control lines, dehydrators, and glycol boilers. Even were we to accept the proposition that repair of property endows one with a proprietary interest, the district court found that "Marathon made no contribution ... toward upkeep or maintenance of TETCO's 20-inch pipeline ..." The only property besides its own that Marathon maintained were TETCO's meter skids, which are located on Marathon's property. We fail to see how this routine maintenance, consisting of the painting, cleaning, and inspecting of meter skids, endows Marathon with functional possession or control over the entire 20-inch pipeline. Indeed, contracts between Marathon and TETCO provided expressly that TETCO "shall be fully responsible for the construction, operation, maintenance, repair, and use of its equipment and property on the ... space" leased from Marathon. The maintenance of relatively minor parts of the pipeline is not equivalent to functional possession or control over the 20-inch pipeline.
 
 
 55
 Finally, Marathon claims that it possessed a "proprietary interest" in the pipeline because TETCO's 20-inch pipeline and Marathon's various appurtenances are permanently and completely integrated. Without Marathon's compressors, separators, coolers, flow lines, dehydrators, and pilot valves, Marathon claims, the 20-inch pipeline would not be functional. Marathon finds support for this gloss of "proprietary interest" in Domar Ocean Transportation, Ltd. v. M/V Andrew Martin,[18] in which we held that a "tug and tow were so operated as an integrated unit that the physical damage to the barge was sufficient to allow [the owner of the barge to] recover[ ] for the loss of use of both under ... Testbank."
 
 
 56
 Marathon misreads Andrew Martin. While Andrew Martin allowed a plaintiff to recover for the loss of use of both the barge he owned and the tug for which he had contracted, we permitted this recovery only because the "physical damage to the barge was sufficient," and "[m]oreover," the barge-owner "had spent $350,000 to install a raised pilothouse aboard the [tug] specifically to enable the [tug] and [barge] to be used together...."[19] In contrast, Marathon claims no injury to property that it actually owned. This fact alone distinguishes Marathon from the barge-owner in Andrew Martin.
 
 
 57
 Marathon claims also that it invested $50 million in capital expenditures in processing facilities, and that this financing is similar to the barge-owner's $350,000 expenditure on the tug. Marathon invested exclusively in facilities it owned, however, not in the 20-inch pipeline already owned by Tetco. Our finding of propriety interest in Andrew Martin is, therefore, inapposite to this case. Absent injury to property it owned and a tangible contribution to the property for which it contracted, we are not prepared to permit Marathon to establish a proprietary interest on the basis that its property and TETCO's 20-inch pipeline were an integrated unit.
 
 
 58
 While Marathon's business is interconnected with TETCO's 20-inch pipeline, Marathon is like any other business that needs a railroad, ship, bridge, or pipeline to introduce its product into the stream of commerce. A producer may depend upon use of the transportation facility, but such reliance does not rise automatically to the level of a proprietary interest in that transportation medium. Other companies' subsequent utilization of TETCO's 20-inch pipeline, as anticipated in TETCO's 1981 application to the Federal Energy Regulatory Commission, and construction of alternate "tie-in" points, as well as Marathon's ability to transport gas through its own modified 12-inch pipeline during the repair of TETCO's 20-inch pipeline, underscore the essential independence of Marathon and TETCO's enterprises: Marathon produces and sells gas; TETCO purchases and transports it.
 
 
 59
 C. McMoRan's Claim that Faustug and Continental Indemnified It
 
 
 60
 The district court rejected McMoRan's claim that Faustug, or Faustug's insurer, Continental, indemnified it against liability for damages resulting from the rupture of TETCO's 20-inch pipeline. The court found that the parties "have not specifically, clearly, and expressly agreed that Faustug would procure P[rotection] & I[ndemnity] insurance that would function as a comprehensive liability policy in favor of McMoRan protecting McMoRan from its own acts of negligence [sic]."
 
 
 61
 The relationship between McMoRan and Faustug originated in Pennzoil's procurement of Faustug's towing services for moving the D/B OCEAN TRAVELER from Block 316 to Block 107. On November 1, 1982, Pennzoil and Faustug entered into a Blanket Towing Agreement which, in its preface, provided that Pennzoil was acting on behalf of itself and
 
 
 62
 all of its subsidiaries, affiliated companies, owners, co-owners and joint-venturers associated therewith, and any of their agents, officers, and employees, hereinafter collectively referred to as 'COMPANY' ...
 
 
 63
 Since Pennzoil retained a 34% ownership interest in McMoRan's lease of Block 107, McMoRan is a co-owner or joint venturer of Pennzoil in exploring this area, and hence, its right to indemnification is governed by this Blanket Towing Agreement.
 
 
 64
 Continental urges this court to hold that two separate contracts existed: one between Pennzoil and Faustug, and another between McMoRan and Faustug. Continental relies upon the fact that Pennzoil and Faustug signed their Blanket Towing Agreement on November 1, 1982, while Pennzoil and McMoRan did not become co-owners or joint-venturers until November 10, 1982. Despite the fact that Pennzoil and McMoRan became co-owners and joint-venturers nine days after the Pennzoil-Faustug agreement, the language of the Blanket Towing Agreement is not limited to Pennzoil's co-owners or joint-venturers as of the date of the towing agreement. To see a separate contract between McMoRan and Faustug blinks reality. Faustug performed, and thought it was performing, towage services under a single contract--the Pennzoil-Faustug Blanket Towing Agreement. As co-owner and joint-venturer of Pennzoil, McMoRan is entitled to rely upon the Blanket Towing Agreement as an articulation of its rights.
 
 
 65
 In Article X of the Pennzoil-Faustug contract, Faustug agreed to provide hull, protection and indemnity (P & I), excess P & I, tower, and pollution insurance. Article X continues:
 
 
 66
 Any language in the policies ... which limits the coverage afforded to an assured who is not a shipowner or who is not entitled to the rights of limitation to which a shipowner is entitled shall be deleted. All of the aforesaid policies shall name COMPANY, its affiliates and subsidiaries as Additional Assureds, and shall provide that all said insurers waive subrogation against COMPANY, its affiliates and subsidiaries.
 
 
 67
 Given the "collective[ ]" definition of "COMPANY" in the preface, the inclusion in Article X of "affiliates and subsidiaries" after "COMPANY" and omission of "owners, co-owners, and joint-venturers" is inexplicable. Co-owners and joint-venturers are included, however, in the term "COMPANY," according to the preface of the Blanket Towing Agreement. We, therefore, construe Article X to include co-owners and joint-venturers as additional assureds. The repetition of "affiliates and subsidiaries" does not alter the definition of "COMPANY" established in the preface to the agreement.
 
 Article XI provides further:
 
 68
 In the event (1) CONTRACTOR [Faustug] should fail to secure the insurance coverages set forth in the preceding paragraphs, with or without the knowledge of COMPANY, or (2) any claims, demands, suits or causes of action, of whatever kind or nature, are brought against COMPANY which arise out of or are connected with, directly or indirectly, the performance of towage services by CONTRACTOR as provided herein, which for any reason are not covered by the insurance protection afforded COMPANY pursuant to the provisions of the preceding paragraph, then CONTRACTOR shall itself be an insurer to the extent it has failed to comply with the obligations to provide insurance hereunder, and further agrees to defend, protect, indemnify and hold COMPANY harmless with respect to all such claims, demands, suits and causes of action even though they arise or result directly or indirectly from the sole or concurrent negligence of COMPANY, whether active or passive, primary or secondary. CONTRACTOR further agrees at its sole cost and expense to procure and continuously maintain in full force and effect throughout the term of this agreement, with reliable insurance companies, and with limits of liability as specified herein, Contractual Liability Insurance covering CONTRACTOR'S undertakings in this agreement and particularly the undertakings set forth in this paragraph.
 
 
 69
 The description of the insurance that Faustug is responsible for providing is straightforward: hull, P & I, excess P & I, tower, and pollution. Article XI enumerates no additional forms of insurance; it states repeatedly that it applies to "the insurance coverages set forth in the preceding paragraphs," to Faustug's failure "to comply with the obligations to provide insurance hereunder," to "limits of liability as specified herein" (emphasis supplied). Faustug's liability for failing to obtain insurance under Article XI is restricted, therefore, to those specific forms of insurance delineated in Article X.
 
 
 70
 The question of insurance under Article XI thus becomes more focused: does Article X of the Blanket Towing Agreement oblige Faustug to insure McMoRan for damages resulting from the negligent retrieval of anchors by a non-ship-owner? We hold that it does not.
 
 
 71
 The usual form of Protection & Indemnity insurance, which "insures only against liability resulting from vessel ownership,"[20] would not provide coverage for McMoRan, a non-ship-owner. McMoRan argues, however, that Faustug was obliged to furnish a P & I policy covering non-ship-owners because of the provision in Article X that "deleted ... [a]ny language in the policies ... which limits the coverage afforded to an assured who is not a shipowner...." (Emphasis added).
 
 
 72
 McMoRan asks us to interpret the clause in a manner not warranted by the contractual language. While Article X reveals that the parties intended to require Faustug to obtain insurance extending some coverage to non-ship-owners, its effect is limited: it requires only the deletion of limiting clauses. There is no "language in the polic[y]," however, that can be "deleted" to make it cover non-ship-owners. We do not delete language in the policy by maintaining the exact text of the policy and altering only its meaning; deletion, like amendment, is different from interpretation. The interpreter's pen, McMoRan's claim demonstrates, can rewrite an entire document based on submerged intentions, but the deleter's eraser is limited to the actual words on the written page. Finding no language in the policy to delete and unable to expand insurance coverage beyond its traditional application without a specific and clear expression of the parties' intent,[21] we conclude that Faustug did not violate the contract by failing to provide P & I insurance. Any P & I insurance that Faustug might have obtained would not have covered McMoRan's negligence, since McMoRan's negligence did not arise out of the ownership of a vessel, but out of the operation of an anchor retrieval process in which the vessel was only "the inert locale of the injury."[22]
 
 
 73
 While Faustug did not provide McMoRan with P & I insurance, McMoRan claims in the alternative that Faustug had agreed to indemnify it. The Blanket Towing Agreement does, in fact, provide that Faustug
 
 
 74
 agrees to defend, protect, indemnify and hold [McMoRan] harmless with respect to all ... claims, demands, suits and causes of action ... of whatever kind or nature, [that] are brought against [McMoRan] which arise out of or are connected with, directly or indirectly, the performance of towage services by [Faustug] ...
 
 
 75
 Because this suit arose out of Faustug's towage of the D/B OCEAN TRAVELER, Faustug and its insurer, Continental, are obliged to indemnify McMoRan against all claims, demands, suits and causes of action against it. Faustug is, therefore, responsible for paying McMoRan's share of the apportionment of fault.
 
 
 76
 D. ODECO's Claim that McMoRan Indemnified It and ODECO's Request for Costs
 
 
 77
 The district court rejected ODECO's claim that McMoRan indemnified it, stating that at the time of the accident, the rig was no longer moving onto location as required by the Drilling Contract between ODECO and McMoRan, and that the parties did not intend for McMoRan to indemnify ODECO for ODECO's actions off of location.
 
 
 78
 Article VIII(D) of the Drilling Contract between ODECO and McMoRan provides:
 
 
 79
 Operator [McMoRan] agrees that Contractor [ODECO] shall be released and relieved from, and agrees to indemnify, hold harmless and defend Contractor [ODECO] against any and all losses, claims, demands, damages and liabilities resulting from or arising out of damages to wells, pipelines, flowlines and any resulting pollution, or loss of production as a result of moving the drilling unit onto or off of, or operations conducted on, Operator's [McMoRan's] designated location, unless caused by the sole negligence of Contractor [ODECO].
 
 
 80
 Since "damage[ ] to ... pipelines" is one of the actions for which McMoRan indemnified ODECO, and this injury was not caused by the sole negligence of ODECO, the only issue is whether the damage caused to TETCO's 20-inch pipeline occurred as a result of moving the D/B OCEAN TRAVELER onto the designated location.
 
 
 81
 In the late afternoon of January 1, before the accident, Craft, ODECO, Faustug, and Chance all knew that the rig was three to four miles off of location. The rig had raised its No. 7 anchor that morning, and was currently engaged in raising its No. 6 anchor, in order to resume moving onto location at Block 107. The move onto location, the district court found, was not complete until final tie-in, until the survey boat provided the final position fix at Block 107 at 1 a.m. on January 5. Although a successful move onto location was interrupted by the storm on the night of the 31st, the move as a whole was still proceeding at the time of the accident. The rig was still in transit between Blocks 316 and 107 when its No. 6 anchor ruptured TETCO's 20-inch pipeline.
 
 
 82
 McMoRan claims that the parties intended that McMoRan indemnify ODECO only for damages occurring in the area of location in Block 107. To support this argument of geographical limitation, McMoRan points to its responsibilities to ensure that the anchor pattern is free of obstructions, and to conduct bottom condition surveys. All of these activities, McMoRan reminds the court, occur on location.
 
 
 83
 These separate contractual obligations on location do not, however, encumber the independent indemnification provision which specifically covers "any and all losses." Nothing in the indemnification provision limits its scope to a certain geographical confine. Damage to pipelines while moving a drilling rig onto location need not occur at the proposed drilling site, as this case amply demonstrates. The district court's interpretation of the drilling contract, therefore, is in error and its application to the facts in this case are erroneous. Accordingly, we hold that McMoRan indemnified ODECO for ODECO's share of damages to TETCO's 20-inch pipeline. ODECO claims, and McMoRan does not challenge, that this figure amounts to $961,712.67, according to the district court's apportionment of liability which we affirm.
 
 
 84
 ODECO claims that it is entitled to costs and attorney's fees as the "prevailing party" under Fed.R.Civ.P. 54(d). Our review of the district court's denial of costs and attorney's fees, however, is "very narrow," limited to rectifying only "clear abuse[s] of discretion."[23] We find no such error.
 
 
 85
 On perhaps the most significant issue in this protracted litigation, ODECO never even prevailed: we affirmed the district court's finding that ODECO was "rather obvious[ly]" at fault for damaging TETCO's pipeline, as negligent as both McMoRan and Chance. The district court, therefore, acted within its sound discretion when it refused to reimburse ODECO for its costs and attorney's fees pursuant to Rule 54(b). ODECO is entitled to attorney's fees, costs, and expenses incurred as a defendant and plaintiff indemnitee in a tort suit,[24] but it " 'enjoys no right to recover its legal fees incurred in establishing its right to indemnification.' "[25]
 
 
 86
 For the foregoing reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED in part. As the district court held, Chance is liable for 10% of the damage to TETCO's 20-inch pipeline. Faustug is liable for 80% of the damage: it is responsible for its own negligence which caused 70% of the damage and, by indemnification, for McMoRan's negligence, which accounted for 10% of the damage. In addition, because McMoRan agreed to indemnify ODECO, McMoRan is liable for the damage caused by ODECO's negligence, or 10% of the damage to TETCO's pipeline. On remand, the district court shall determine the amount of attorney's fees, costs, and expenses to which ODECO is entitled. In making this calculation, it shall not reimburse ODECO for the attorney's fees and costs it incurred in prosecuting its claim for indemnity against McMoRan.
 
 
 87
 ON PETITIONS FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC
 
 
 88
 (April 24, 1989)
 
 
 89
 Marathon's petition for rehearing and rehearing en banc is denied.
 
 
 90
 ODECO's petition for rehearing to increase its award is denied. Prior to trial, TETCO settled its claim against ODECO, Faustug, and Continental for $9.5 million, assigning to these companies its remaining rights against McMoRan, Chance, and Arthur Levy.
 
 
 91
 Ordinarily, ODECO's payment in pretrial settlement, if reasonable, would be the measure of its losses and liabilities, and McMoRan, as indemnitor, would be obliged to indemnify ODECO for that amount. ODECO's payment to TETCO, however, not only settled TETCO's claim against ODECO, but was the consideration for TETCO's assignment to ODECO of claims against McMoRan and Chance. ODECO thus acquired TETCO's right to recover a portion of McMoRan's and Chance's liability for damaging TETCO's pipeline. Neither the agreement nor any information in the record gives us any basis to determine what portion of ODECO's settlement with TETCO represents its own liability for damaging TETCO's pipeline and what amount represents the value of the right to pursue TETCO's claim against non-settling tortfeasors. We, therefore, hold that McMoRan's indemnification of ODECO amounts to $961,712.67, ODECO's liability as determined by the district court.
 
 
 92
 McMoRan's application for rehearing and ODECO's application for rehearing to award it attorney's fees, costs, and expenses having been considered, the court's original opinion is modified as follows.*
 
 
 93
 The Petitions for Rehearing are DENIED and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Federal Rules of Appellate Procedure and Local Rule 35) the Suggestion for Rehearing En Banc is DENIED.
 
 
 94
 ON PETITIONS FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC
 
 
 95
 (May 26, 1989)
 
 
 96
 In Lanasse v. Travelers Insurance Co.,[1] we did not require indemnification because the indemnitee's negligence, which proximately caused the injury, was "not even remotely related to the operation ... of the [indemnitor's] vessel." In this case, Faustug was towing the drilling rig to its final destination, the towing was interrupted by an interlude in which the drilling rig released its anchors, and McMoRan retrieved the anchors so that Faustug might resume towage services. McMoRan's negligent retrieval of the anchors, one of many causes of the casualty, was the direct and necessary precursor to recommencing Faustug's towage services. The claims brought against McMoRan, therefore, arose out of and were connected with Faustug's performance of towage services, and Faustug is obliged to indemnify it.
 
 
 97
 Whether Continental and ODECO should recover the $950,118.47 paid for their release is, as Continental states in its application for rehearing, an issue that is unnecessary for us to reach, and we intimate no opinion on it.
 
 
 98
 Continental Insurance Company's and Faustug's petitions for rehearing are therefore DENIED and no member of the panel or Judge in regular active service of this court having requested that the Court be polled on rehearing en banc (Federal Rules of Appellate Procedure and Local Rule 35), the suggestion for Rehearing En Banc is DENIED.
 
 
 
 [1]
 Hercules, Inc. v. Stevens Shipping Co., 765 F.2d 1069, 1075 (11th Cir.1985)
 
 
 [2]
 727 F.2d 427 (5th Cir.1984)
 
 
 [3]
 Wallace, 727 F.2d at 436-37
 
 
 [4]
 Wallace, 727 F.2d at 437
 
 
 [5]
 See Marathon v. Sea Level II, 806 F.2d 585, 590 (5th Cir.1986)
 
 
 [6]
 Marathon Pipeline Co. v. Drilling Rig Rowan/Odessa, 527 F.Supp. 824, 834 (E.D.La.1981), aff'd 699 F.2d 240 (5th Cir.1983), cert. denied, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983)
 
 
 [7]
 Hercules, 765 F.2d at 1075
 
 
 [8]
 Gator Marine Serv., Etc. v. J. Ray McDermott & Co., 651 F.2d 1096, 1099 (5th Cir.1981); Hercules, 765 F.2d at 1075 n. 11
 
 
 [9]
 275 U.S. 303, 48 S.Ct. 134, 135, 72 L.Ed. 290 (1927)
 
 
 [10]
 752 F.2d 1019, 1022 (5th Cir.1985) (en banc), cert. denied, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986)
 
 
 [11]
 Testbank, 752 F.2d at 1022; Robins, 48 S.Ct. at 135. (While I continue to adhere to Judge Wisdom's dissent in Testbank, in which I joined, I recognize that the decision is the law of the circuit.)
 
 
 [12]
 Robins, 48 S.Ct. at 135 (citations and portions of text omitted). See East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 106 S.Ct. 2295, 2302-04, 90 L.Ed.2d 865 (1986); Prosser & Keeton, The Law of Torts (5th Ed.1984) at 1001; Restatement (2d) of Torts Sec. 766C (1973)
 
 
 [13]
 Testbank, 752 F.2d at 1023, 1028, 1029
 
 
 [14]
 453 F.2d 1202 (5th Cir.1972)
 
 
 [15]
 Id., 453 F.2d at 1204
 
 
 [16]
 597 F.2d 469 (5th Cir.1979)
 
 
 [17]
 Id., 597 F.2d at 474
 
 
 [18]
 754 F.2d 616, 617 (5th Cir.1985)
 
 
 [19]
 Id., 754 F.2d at 617, 619 (emphasis supplied). See Consolidated Aluminum Corp. v. C.F. Bean Corp., 772 F.2d 1217 (5th Cir.1985) aff'd 833 F.2d 65 (1987), cert. denied, --- U.S. ----, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988)
 
 
 [20]
 Wiley v. Offshore Painting Contractors, Inc., 716 F.2d 256, 257 (5th Cir.1983) (emphasis supplied); Gryar v. ODECO, Inc., 719 F.2d 112, 116 (5th Cir.1983)
 
 
 [21]
 See Branch v. Fidelity & Casualty Co. of New York, 783 F.2d 1289, 1294 (5th Cir.1986); Knapp v. Chevron U.S.A., Inc., 781 F.2d 1123, 1127-28 (5th Cir.1986)
 
 
 [22]
 Lanasse v. Travelers Insurance Company, 450 F.2d 580, 584 (5th Cir.1971), cert. denied, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972) (footnote omitted)
 
 
 [23]
 In Re Nissan Antitrust Litigation, 577 F.2d 910, 918 (5th Cir.1978), cert. denied, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979); Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987); United States v. Mitchell, 580 F.2d 789, 793-94 (5th Cir.1978)
 
 
 [24]
 Signal Oil & Gas Co. v. Barge W-701, 654 F.2d 1164, 1178 (5th Cir.1981), cert. denied, 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982)
 
 
 [25]
 Weathersby v. Conoco Oil Co., 752 F.2d 953, 959 (5th Cir.1984) (citing Signal Oil & Gas Co., 654 F.2d at 1178)
 
 
 *
 Modifications have been incorporated in text of opinion
 
 
 [1]
 450 F.2d 580, 584 (5th Cir.1971), cert. denied, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972)