HERCULES, INC., Plaintiff-Appellee,

v.

STEVENS SHIPPING CO., et al.,
Defendants-Appellants,

Aetna Casualty & Surety Company,
Third Party Defendant-Appellee.

No. 84–8198.

United States Court of Appeals,
Eleventh Circuit.

July 16, 1985.

Gustave R. Dubus, III, Savannah, Ga., for Detco.

Robert S. Glenn, Jr., Savannah, Ga., for Stevens Shipping Co.

Edwin D. Robb, Jr., Savannah, Ga., for Hercules, Inc.

Allen F. Campbell, New Orleans, La., for Aetna Cas. & Sur. Co.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

On June 29, 1975, the barge Herwood capsized in the Caribbean Sea, losing its cargo of some 4,350 telephone poles and sustaining substantial damage to its hull. The parties then embarked upon an odyssey of litigation, which, ten years after the capsize, finally has culminated in the instant appeal. Stevens Shipping Co., Inc., the stevedoring firm that loaded the poles onto the barge, appeals from a judgment holding it liable to Aetna Casualty & Surety Co., the cargo owner's subrogated insurer, for 35% of the damages sustained by the cargo owner plus prejudgment interest. We affirm.[1]

## I. FACTS AND PROCEDURAL HISTORY

In early 1974, Escambia Treating Co., Inc. ("Escambia") entered into a contract for the sale and delivery of telephone poles from Brunswick, Georgia to Puerto Rico. On April 25, 1975, Escambia chartered the barge Herwood from its owner, Hercules, Inc. ("Hercules"), for the purpose of delivering the poles to Puerto Rico. Two days earlier, Hercules had amended a long-term contract with Detco Towing Co. ("Detco") to provide for towage of the Herwood by Detco's tug, the Tracy D.

The Herwood was a flush-deck barge, approved for oceangoing service by the American Bureau of Shipping and measuring 200 feet long, 45 feet wide, and 14 feet, 6 inches from keel to main deck. On the main deck, Hercules had constructed, from highway guard rails and chain link fence, a cargo pen measuring 185 feet long, 35 feet wide, and 12 feet high. Below the main deck, the barge was divided into 24 compartments, consisting of eight wing compartments along each side of the barge and eight center compartments. Each wing compartment was connected to the opposite wing compartment by a four-inch pipe.

In the charter party with Hercules, Escambia agreed to transport no more than 2000 short tons of telephone poles on the Herwood at a time. To accommodate the maximum number of poles, and with Hercules' permission, Escambia welded three feet of pipe to the top of the existing stanchions enclosing the cargo pen, extending the height of the cargo pen to 15 feet. Escambia hired Stevens Shipping Co., Inc. ("Stevens"), a stevedoring firm, to load the poles onto the barge and stow and lash the poles. In the spring of 1975, Stevens loaded approximately 1950 short tons of poles onto the Herwood for shipment from Brunswick to Puerto Rico. This trip was completed without incident.

In early June, 1975, preparations began for another delivery of telephone poles to

---

1. In addition to the primary appeal, Detco Towing, Inc. ("Detco"), the owner and operator of the tug that towed the barge, appeals from a judgment denying its cross-claim for indemnity and contribution against Hercules, Inc., the barge owner. Detco's cross-claim was rendered moot, however, when the court below also ruled that Detco was liable to neither Stevens Shipping Co. nor Aetna Casualty & Surety Co., the only parties who sought recovery from Detco. Because Stevens Shipping Co. does not appeal the denial of its claim against Detco, we need not address any of the issues presented by Detco's appeal.

Puerto Rico.[2] Escambia secured from Aetna Casualty & Surety Co. ("Aetna") a marine open cargo insurance policy for $409,-990.49, to cover this second shipment. Escambia transported the poles to Brunswick by rail, and both the railroad freight bills and stevedoring charges reflect that 2,056 short tons of poles were delivered and loaded onto the barge.[3]

Stevens loaded the poles onto the barge in a pre-slung condition, that is, in bundles of four to six poles. Although a marine surveyor had recommended that at least three wires be run across the top of each draft, or bay, of poles, Stevens used only two wires across most of the drafts. In addition, although the most secure method of lashing the poles onto the barge would have been to run wires at approximately every other tier with double turns in the wire, Stevens ran only one series of wires several feet above the deck and then added only one other series of wires on top of the cargo. Stevens did not loop the lashings to prevent movement of the cargo. The piles of poles reached a height of fifteen feet or more above deck.

During the loading, one of Escambia's marine surveyors, Harry Jennings, noticed that the International Load Line Certificate for the barge referred to stability restrictions contained in a Coast Guard Stability Letter, which should have been but was not attached to the certificate. Jennings checked with Hercules and discovered that the recommended vertical center of gravity for the barge was some four feet lower than that resulting from Stevens' loading of the poles. Because the barge already had successfully completed one voyage, however, Jennings took no action.

2. The second voyage was made pursuant to an extension of the charter party between Escambia and Hercules, dated June 9, 1975.

3. The court below found that the shipment of poles might have consisted of "as much as 2,100 short tons."

4. Photographs of the Herwood taken by the crew while in Puerto Plata clearly show that some of the poles had shifted to the port side.

After the poles were loaded onto the barge, Escambia's marine surveyors inspected both the barge and cargo and approved them to proceed to Puerto Rico. The Herwood left Brunswick on July 11 with a two- or three-inch port list, which the captain of the Tracy D indicated would present no problems. On June 23, however, when the tug and tow arrived at Puerto Plata, Dominican Republic, for refueling, the barge's port list was quite severe, with only three-and-a-half inches of freeboard remaining on the port side. This severe list had been caused by a shifting of the cargo.[4]

The tug captain notified Detco and Hercules of the problem, and Hercules' naval architects proposed three solutions. The first two solutions, restowing the cargo and towing the barge backwards, proved impractical.[5] The third solution was to pump water into one of the starboard compartments to balance the weight of the shifted poles. The architects cautioned, however, that the crossover pipes had to be capped to prevent the water from moving across into the port compartments, and that the cargo had to be secured to prevent it from re-shifting to the starboard.

Hercules directed Detco to have the tug captain cap the pipes, put fourteen feet, two-and-a-half inches of water in the number five starboard compartment, and tighten the lashings of the cargo. The captain followed these directions, except that he mistakenly put the water in the number four starboard compartment. The barge returned to a level position. The captain felt that the situation was less than desirable, and he so informed Detco and Hercules. Nevertheless, Detco and Hercules

The only other possible explanation for the port list was that water had entered the port compartments. Upon arrival in Puerto Plata, however, several inspections revealed that these compartments were dry.

5. Upon inquiring, the tug captain was told that no cranes were available in the Dominican Republic to restow the cargo, and the captain decided that the barge could not be towed backwards.

agreed that the tug and tow should proceed to Puerto Rico.

The flotilla departed Puerto Plata on June 27 and encountered rough weather. By the next day, when the weather cleared, the barge had begun to list to starboard. On June 29, the list worsened, and at 8:10 a.m., the barge slow-rolled over to the starboard, losing the cargo and sustaining severe structural damage. The barge was towed in its capsized condition to Puerto Rico, where, upon inspection, an 18-inch crack was discovered seven feet below the water line in the center forward area of the barge. The marine growth near the crack had not been disturbed and there was bright rust around the crack, indicating it was of recent origin and had been caused by, rather than the cause of, the capsize.

Hercules filed suit against Detco, the Tracy D, Stevens, and Escambia, seeking to recover for the damage to the Herwood. Aetna paid Escambia for the loss of the telephone poles and intervened in Hercules' lawsuit to pursue its subrogated cargo claim against Detco and Stevens. Stevens impleaded the National Cargo Bureau ("NCB") and Charles T. Theus, Inc. ("Theus"), the marine surveyors hired by Escambia to inspect the barge and cargo. The parties also filed numerous cross-claims and counterclaims. After several years of litigation concerning issues unrelated to this appeal,[6] the case went to trial in late 1983. During the first day of trial, Hercules' claims were settled, leaving Aetna as the only remaining party-plaintiff.

After hearing the evidence, the district court concluded that the shifting of the cargo while the barge was en route between Brunswick and Puerto Plata was caused by "the improper lashing and loading of the cargo." The court found that:

STEVENS was negligent in failing to properly secure the cargo. It should

have provided bracing or shocks on the lower layer of the stow to prevent the possibility of the shifting of the cargo. Stevens should have utilized more wires in, through, and around the stow in order to hold it tight and secure, and was negligent in that respect. Stevens was negligent in failing to use at least three wires per bay of the poles in order to secure them. Stevens was negligent in failing to see that the wires were secured with the proper and sufficient number of clips adequately fastened in an appropriate manner. Stevens was negligent in loading and stacking the cargo too high on the barge when it knew, or should have known, that it was improper and dangerous to do so.

With respect to the eventual capsizing of the Herwood, the court concluded that:

The barge ultimately capsized because the righting of the barge by the addition of water ballasts caused some shifting of the cargo toward the starboard side, increasing the barge's instability and causing it to capsize. The excessive load and its too high center of gravity and the improper lashing contributed to the casualty.

. . .

The loss of the cargo was proximately caused by the joint and concurrent negligence of Hercules, Detco, Stevens, and Escambia.

The Court finds as a matter of fact that the negligence shall be apportioned as follows:

STEVENS—*thirty-five percent;*
HERCULES—*thirty-five percent;*
DETCO—*twenty percent; and*
ESCAMBIA—*ten percent.*

The court held that Aetna, as subrogee, could not recover against Escambia. The court also held that the contract between Hercules and Escambia precluded Aetna

---

**6.** Detco and Stevens filed motions to dismiss Aetna's intervention based on the one-year limitation period contained in the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1303(6). Stevens' motion was denied, but Detco's motion was granted. Meanwhile, Escambia filed a cross-claim against Detco, seeking indemnifica-

tion. The district court granted Detco's motion for summary judgment against Escambia. Aetna and Escambia appealed. A panel of the former Fifth Circuit affirmed, *Hercules, Inc. v. Stevens Shipping Co., Inc.,* 629 F.2d 418 (5th Cir.1980), but the *en banc* court reversed and remanded, 698 F.2d 726 (5th Cir.1983).

from recovering against Hercules, and that the limitations contained in the Carriage of Goods by Sea Act ("COGSA") barred recovery against Detco. The court entered judgment in favor of Aetna, and against Stevens, for 35% of the amount of the cargo loss plus prejudgment interest from the date on which Aetna paid Escambia's claim. This appeal ensued.

## II. DISCUSSION

### A. Are the District Court's Findings of Fact that Stevens Negligently Loaded and Lashed the Cargo Clearly Erroneous?

■ Stevens' first argument is that the district court's findings of fact that Stevens negligently loaded and lashed the cargo are clearly erroneous. In particular, Stevens challenges the court's findings that (1) Stevens should have provided bracing or shocks on the lower layer of the stow, (2) Stevens improperly lashed the cargo, and (3) Stevens negligently stacked the cargo too high on the barge. A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ Our review of the evidence convinces us that the district court's findings are not clearly erroneous. First, although none of the experts explicitly mentioned the use of bracing or shocks, Howard Smith, Stevens' foreman in charge of loading the Herwood, testified that it was important to avoid gaps, or "voids," in the piles of poles. The self-evident reason for

this is that shifting and settling of the poles in the middle or at the bottom of a pile might cause the wires holding the top of the pile to loosen, leading to instability of the entire pile. Captain Davenport, an expert witness hired by Aetna, testified that creosoted poles like those aboard the Herwood "will move when they settle down among themselves" and "create little openings." He also stated that the manner in which Stevens secured the lower layer of poles "wouldn't stop them from moving from side to side." In view of this testimony, the court's factual finding that Stevens should have used bracing or shocks on the lower layer of the stow, to prevent such shifting, is not clearly erroneous.

Second, there was ample evidence that Stevens' lashing of the cargo was inadequate. Howard Smith testified that more lashings, used at various intervals, would have made the cargo more secure. He admitted, however, that the only wires used to hold the poles in place were one set of wires over the first tier of poles (about three or three-and-a-half feet above the deck), another set of wires over the top of the poles (at least fifteen feet above the deck), and two "round turns" of wire,[7] one at the bow and one at the stern of the barge. Smith also testified that each bay of poles was secured with only two wires at each of the three-foot and fifteen-foot levels, except for the bays containing the longest poles, for which three wires were used. Captain Davenport opined that "they should have used at least one more wire" per bay, and that "they could have used more wire and more shackles and more turnbuckles." He also testified that "the biggest thing was that they did not take round turns around the pole bundles."[8]

---

7. "Round turns" are wires run under and then over one or more bundles of poles, forming a "ring" around the bundles and preventing them from shifting or rolling out.

8. It is apparent from Captain Davenport's testimony that he believed that "round turns" should have been used throughout the stow, at both ends of each bundle of poles, and not merely at

the bow and stern of the barge as actually was done.

Stevens contends that, on cross-examination, Captain Davenport admitted that the number of lashings used by Stevens to secure the poles "should do a good job." Captain Davenport also explained, however, that this statement would be true only if sufficient "round turns" were made in the stow.

According to Captain Davenport, the use of "round turns" was "pretty-much standard for all round-type of pipe, poles, and that type."

Finally, with respect to the height of the cargo, Howard Smith testified that the poles ·should not have been loaded above the fifteen-foot level of the stanchions enclosing the cargo pen, and that he would not have been doing his job correctly if he loaded the poles higher than fifteen feet. Yet photographs of the Herwood taken in Puerto Plata clearly reveal that the poles had been stacked so that the "crown" was higher than fifteen feet, and perhaps as high as eighteen feet. Captain Davenport stated that, in his opinion, the excessive height of the poles was one factor that led to the capsize. We hold, therefore, that the factual findings of the court below concerning Stevens' acts of negligence in loading and lashing the cargo are not clearly erroneous.

**B. Did the District Court Use an Incorrect Legal Standard in Judging Stevens' Performance?**

■■■ Stevens also argues that the district court used an incorrect legal standard in judging its performance. According to Stevens, the court erroneously imposed a legal duty of "perfection" in the loading and lashing of the cargo, whereas the proper standard is simply that of exercising "reasonable care." Stevens relies on *Bache v. Silver Line*, 110 F.2d 60 (2d Cir. 1940), in which Judge Learned Hand wrote:

In the carriage of goods the trade must always come to some accommodation between ideal perfection of stowage and entire disregard of the safety of the goods; when it has done so, that becomes the standard for that kind of goods. Ordinarily it will not certainly prevent any damage, and both sides know that the goods will be somewhat exposed; but if the shipper wishes more, he must provide for it particularly.

*Id.* at 62.

In our view, this is nothing more than a factual argument dressed in a legal argument's clothing.[9] We find no suggestion in the record that the district court used a "perfection" standard, nor did the court hold Stevens strictly liable for the cargo loss. On the contrary, as the preceding discussion reveals, the court below properly concluded that Stevens negligently loaded and lashed the cargo. We thus reject Stevens' claim that the district court applied an incorrect legal standard in judging its performance.[10]

**9.** Or, as Aetna's brief on appeal puts it, Stevens seems to be "[s]oftly whistling in the dark shadow of *McAllister* and the clearly erroneous standard."

**10.** As a subsidiary argument, Stevens contends that it was entitled to rely on the directions and supervision of Escambia's marine surveyors. The problem with this argument is two-fold. First, neither Harry Jennings, the Theus marine surveyor, nor Joseph Harwell, the NCB marine surveyor, were physically present during most of the time the Herwood was being loaded.

Second, even if one or both of the marine surveyors *had* been present, this would not have absolved Stevens of responsibility for its negligence; rather, the marine surveyors' approval of the manner of loading and lashing the cargo would simply have constituted evidence that Stevens did not act negligently. *Cf. Hartford Fire Insurance Co. v. Calmar Steamship Corp.*, 404 F.Supp. 442, 446 (W.D.Wash.1975) ("Moreover, the absence of vigorous dissent to this stowage plan by either [the vessel owner] or [the stevedore] prior to or during the loading of the [vessel] further belies [the vessel owner's] contention [that the stowage plan was deficient]."), *aff'd*, 554 F.2d 1068 (9th Cir.1977). The same is true with respect to the NCB certificate that was issued after Harwell's inspection of the Herwood. *See SS Amazonia v. New Jersey Export Marine Carpenters, Inc.*, 564 F.2d 5, 9 (2d Cir.1977) ("[W]e are inclined to accept the appellant's argument that the [NCB] certificate could not conclusively free the contractor from liability. . . ."); *cf. General Electric Co. v. SS "Nancy Lykes"*, 536 F.Supp. 687, 691 (S.D.N.Y. 1982) (NCB certificate used as evidence to rebut suggestion that stowage was improper), *aff'd on other grounds*, 706 F.2d 80 (2d Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). We do not find such evidence sufficient, on the facts of this case, to render the district court's findings concerning Stevens' negligence clearly erroneous.

**C. Do the Doctrines of Intervening Negligence or Last Clear Chance Absolve Stevens of Liability for the Capsize?**

■ Stevens contends that, even assuming it negligently loaded and lashed the cargo, the true cause of the capsize was not its negligence, but rather the unseaworthiness of the barge and the failure of Detco and Hercules to correct the problems apparent when the flotilla arrived in Puerto Plata. Stevens argues that, whether viewed in terms of intervening negligence or last clear chance, its negligence was "too remote" to give rise to liability for the loss of the cargo.[11]

This argument is constructed on a faulty legal foundation. The doctrines of intervening cause and last clear chance, like those of "major-minor" and "active-passive" negligence, operated in maritime collision cases to ameliorate the harsh effects of the so-called "divided damages" rule, under which damages were divided evenly between negligent parties. *See, e.g., Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 500–01 (5th Cir.1982) (discussing doctrine of "active-passive" negligence).[12] In 1975, however, the Supreme Court rejected the "divided damages" rule, replacing it with a system of "proportional fault." *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The "proportional fault" concept subsequently was applied by this court's predecessor to disputes between vessels and stevedores over cargo losses caused, in part, by negligent stowage of the cargo. *See Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1098–1100 (5th Cir. Unit A 1981);[13] *accord, Agrico Chemical Co. v. M/V Ben W. Martin*, 664 F.2d 85, 92–94 (5th Cir.1981).

■ Under a "proportional fault" system, no justification exists for applying the doctrines of intervening negligence and last clear chance. *Cf. Loose*, 670 F.2d at 501–02 (reaching same conclusion with respect to doctrine of "active-passive" negligence). Unless it can truly be said that one party's negligence did not in any way contribute to the loss, complete apportionment between the negligent parties, based on their respective degrees of fault, is the proper method for calculating and awarding damages in maritime cases. *See generally Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 981–82 (5th Cir.1978). The doctrines of intervening negligence and last clear chance should not be used to circumvent this "proportional fault" concept. We therefore decline Ste-

**11.** Stevens also argues that its negligence was not a proximate cause of the capsize. We disagree. The evidence is undisputed that the shifting of the cargo caused the barge to develop the severe port list en route between Brunswick and Puerto Plata. According to the court below, Detco's and Hercules' attempts to correct for this port list, coupled with the subsequent reshifting of the cargo to starboard, led to the capsize. The court specifically found that "[t]he excessive load and its too high center of gravity and the improper lashing contributed to the casualty." We see no reason to disturb these factual findings. *See S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 166 (5th Cir. 1979) (contributory negligence and proximate cause are factual issues), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

**12.** Even under the "divided damages" rule, the doctrines of intervening negligence and last clear chance were disfavored by admiralty courts. *See S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 169 (5th Cir.1979) ("[T]he doctrine of last clear chance is rarely applied in admiralty cases and then only where there is a definite line of cleavage between the final fault and the preceding acts of negligence."), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Watz v. Zapata Off-Shore Co.*, 431 F.2d 100, 115–17 (5th Cir. 1970) (questioning whether doctrine of intervening negligence should apply in maritime cases); G. Gilmore & C. Black, The Law of Admiralty 494 (2d ed. 1975) ("[T]he maritime court has been less ready than the shore courts to find that a subsequent wrongful act by one party breaks the chain of causation connecting the accident with the prior negligence of the other party.")

**13.** The *Gator Marine Service Towing, Inc.* decision was rendered on July 29, 1981. The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

vens' invitation to reverse the judgment of the court below on this ground.

#### D. Did the District Court Improperly Award Prejudgment Interest to Aetna?

Stevens' final claim is that, because much of the pre-trial delay in this case was attributable to Aetna's 1980 appeal from the dismissal of its intervention petition,[14] and because the case involved numerous parties and complex issues, the district court improperly awarded prejudgment interest to Aetna. We reject this claim on the basis of *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724 (5th Cir. Unit A 1980), in which this court's predecessor explained:

> As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. Discretion to deny prejudgment interest is created only when there are "peculiar circumstances" that would make it inequitable for the losing party to be forced to pay prejudgment interest....
>
> ... Whether such circumstances exist is a question of fact, and the standard to be applied on review is the "clearly erroneous" standard.... But even if an appellant can demonstrate that it would be clearly erroneous to say that there are no peculiar circumstances, the appellant must further show that when the trial court declined the request to deny prejudgment interest, the trial court abused the discretion that was created by the peculiar circumstances.

*Id.* at 728–29. Even assuming that Stevens is correct in asserting the existence of "peculiar circumstances" that might warrant the denial of prejudgment interest, Stevens has not shown that the court below abused its discretion in awarding prejudgment interest to Aetna.

### III. CONCLUSION

On the basis of the foregoing discussion, the judgment of the district court is hereby AFFIRMED.

14. *See supra* note 6.