**LONE STAR INDUSTRIES, INC.,**
**Appellee/Cross–Appellant,**

v.

**MAYS TOWING COMPANY, INC.,**
**Appellant/Cross–Appellee.**

Nos. 89–2869, 89–2982.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 8, 1990.

Decided March 21, 1991.

Gary T. Sacks, St. Louis, Mo., for appellant/cross-appellee.

William R. Bay, St. Louis, Mo., for appellee/cross-appellant.

Before JOHN R. GIBSON, MAGILL and BEAM, Circuit Judges.

BEAM, Circuit Judge.

This appeal arises from a judgment of the district court, sitting in admiralty, in favor of Lone Star Industries, a cement producer whose barges Mays Towing Company transports on the Mississippi River between Cape Girardeau, Missouri, and Memphis, Tennessee. At issue is the sinking of the barge LS 1501, taken in tow on December 23, 1983, by a Mays Towing tugboat and delivered to Lone Star at Memphis on December 25, 1983. The LS 1501, full of cement, sat at Lone Star's dock for three days, and then, during unloading on December 28, 1983, with most of its cargo still onboard, it sank. Following a seven-day bench trial, the district court found that both parties were negligent, attributed fault at sixty percent to Mays Towing, forty percent to Lone Star, and awarded damages of $162,236.49 to Lone Star. We reverse.

## I. BACKGROUND

Lone Star produces cement in Cape Girardeau and ships some of it by barge to its Memphis facility. For this purpose, Lone Star maintains a fleet of double-raked, self-unloading cement barges, a rare commodity among inland river barges. The cement barge that sank, the LS 1501, was manufactured in 1949, and, by the testimony of several experts at trial, was, in December of 1983, at or near the end of its useful life. Mays Towing, which itself owns no barges, regularly transported cement barges for Lone Star between Cape Girardeau and Memphis. It used two of its tug boats, the M/V Sherry K. Mays and the M/V Peggy Mays, to tow the LS 1501.

The district court found that the barge was undamaged when received by the Sherry K. Mays on the evening of December 23, 1983, at Cape Girardeau. The LS 1501, loaded with approximately 1,400 tons of cement, was placed in tow together with the LS 1502 and LS 1503 for the trip to Memphis on an icy Mississippi River. From Cape Girardeau almost to Memphis, the LS 1502 was the lead barge, with the LS 1503 to the port side of the LS 1501, behind the LS 1502. At Cairo, Illinois, the Peggy Mays joined the tow; the Sherry K. Mays faced up to the stern of the LS 1501 and the Peggy Mays to the LS 1503. At Columbus, Kentucky, the Sherry K. Mays left the tow, and the Peggy Mays moved over, facing up to the stern of the LS 1501, where the Sherry K. Mays had been.[1] The barges remained in the same configuration until they reached Island 39, fifteen miles

---

1. Lone Star makes much of this maneuver, having apparently attempted to prove at trial that this face-up was negligent and the cause of a fracture in the hull of the LS 1501, which fracture indisputably was a cause of its sinking. Lone Star's expert, John G. Stickling, Jr., testified that his review of the tug captain's deposition led him to believe that this maneuver caused the fracture. Trial Transcript vol. 4, at 21. Stickling contradicted his own speculation, however, by indicating that the fracture was probably *not* caused by the tugboat's tow knee. *Id.* at 117. Others testified at trial that there *was no reason to think that this maneuver was* either negligent or the cause of the fracture. *See, e.g., id.* vol. 6, at 156; vol. 7, at 27. That the district court made no finding of a specific act of negligence, but instead relied on res ipsa loquitur to raise an inference of negligence, itself suggests that the court rejected the argument that this maneuver was performed negligently. Moreover, arguing that this maneuver was done negligently makes little sense on appeal. Res ipsa loquitur applies precisely because the court is unable to explain an accident that would not normally occur absent some negligence.

above Memphis. There the Peggy Mays turned the entire tow around, so that the 1501, stern first, was at the front of the tow. The barges reached Memphis in the early afternoon on December 25, 1983. All crew members testified that nothing unusual occurred en route.

Unloading was the responsibility of Lone Star employees, so the Peggy Mays left the barges moored at the dock while it remained nearby, as it was required to do until the barges were unloaded. The LS 1501 sat at the dock without listing, in normal trim, covered with ice and snow (up to ten or twelve inches on its stern), until December 27. On that day, Lone Star employees attempted to conduct a standard pre-unloading inspection, which normally involved opening all the hatches and entering the void compartments to look for water or hull damage. Because the barge is unloaded bow to stern, so that part of the stern necessarily submerges during unloading, an inspection of the stern compartments is especially critical. While they did open the forward hatches, as a result of accumulated ice, which they attempted to chip away from the hatches with sledgehammers, Lone Star employees were unable to open the stern hatches. They waited until the next day, December 28, but the weather did not relent, and they were still unable to inspect the stern compartments. Under some financial pressure to unload the barges, and knowing that the LS 1502 had been unloaded without incident, Lone Star took, by its own admission, a calculated risk, and decided to unload the LS 1501 without inspection of the stern compartments.

Unloading began at mid-afternoon on December 28 with one employee present, as was Lone Star's practice. That employee worked inside the pump room of the barge, located at the bow and from which location he could not see the stern during unloading. Testimony at trial suggested that other cement companies used two or three people to supervise unloading, and one expert called Lone Star's practice of unloading with only one person "ludicrous." By 8:00 p.m., Lone Star was aware that the barge was taking on water at the stern, and by 10:00 p.m., water was covering the stern deck, something that should never happen. The cold, icy conditions hampered rescue efforts, and the barge sank. The LS 1503 was not unloaded until the ice on its stern melted, on January 5, 1984.

Later, when the LS 1501 was raised, marine surveyors found a vertical crack in its stern log—the heavy steel at the stern of the barge to which tugboats face up. The crack was eight or ten inches above the waterline, but, because the barge is unloaded bow to stern, it became submerged during unloading. No one disputes that the barge sank because water entered the stern compartments through the crack.

Because the barge was undamaged when picked up by the Sherry K. Mays, the district court concluded "that the negligence of Mays Towing Company caused the damage to the LS 1501, resulting in the loss of the barge and its cargo." *Lone Star Indus. v. Mays Towing Co.*, 725 F.Supp. 440, 444 (E.D.Mo.1989). The district court also held that Lone Star was negligent in failing to inspect the stern compartments prior to unloading and in employing only one person during unloading. Thus, the district court determined the fault of Mays Towing to be sixty percent, and that of Lone Star to be forty percent. The court valued the barge at $35,000, its cargo at $55,000, and awarded an additional $180,394.15 in necessary expenses. Total damages were then reduced by the comparative fault of Lone Star. *Id.* at 444–45. Both parties appeal.[2]

## II. DISCUSSION

### A. Res ipsa loquitur

As indicated, the district court found that the barge was undamaged and seaworthy when it left Cape Girardeau. *Id.* at 443. It also found that the barge sank because of the fracture in its stern log. *Id.* at 441. The district court opinion does not, how-

---

**2.** On cross-appeal, Lone Star argues that the district court erred in refusing to enforce an alleged contract of indemnity between Lone Star and Mays Towing, and in calculating the value of the barge. Our holding makes consideration of these issues unnecessary.

ever, recite any instances of negligent conduct by Mays Towing, nor does it suggest any actions that may have caused the fracture. Indeed, our review of the record discloses nothing that might explain when the barge was damaged. Given this uncertainty, the district court relied on res ipsa loquitur to raise an inference that Mays Towing was negligent in its care of the barge. "This is the very type of case in which the doctrine of res ipsa loquitur was intended to apply." *Id.* at 443–44. From its premise that the damage to the barge must have occurred en route to Memphis, the district court moved to a conclusion that the elements of res ipsa loquitur were met: the barge was in the exclusive control of Mays Towing, Lone Star could not have caused the damage en route, and "the damage to the LS 1501 is of a type that ordinarily does not occur in the absence of negligence." *Id.* at 444. The court held that Mays Towing did not rebut the inference of negligence.

We may not set aside the judgment of the district court sitting in admiralty unless it is clearly erroneous. *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); *Alter Barge Line v. TPC Transp. Co.,* 801 F.2d 1026, 1028 (8th Cir.1986); *Consolidated Grain & Barge Co. v. Huffman Towing Co.,* 801 F.2d 1072, 1074 (8th Cir.1986). A finding of negligence in admiralty is a finding of fact, and is entitled to clearly erroneous review. *Consolidated Grain & Barge,* 801 F.2d at 1074; *United Barge Co. v. Notre Dame Fleeting & Towing Serv.,* 568 F.2d 599, 602 (8th Cir.1978). More specifically, the district court's application of res ipsa loquitur is subject to the clearly erroneous standard. *United States v. Baycon Indus.,* 804 F.2d 630, 633 (11th Cir.1986). *But cf. Ashland v. Ling–Temco–Vought, Inc.,* 711 F.2d 1431, 1437–38 (9th Cir.1983) (whether res ipsa loquitur applies to given set of facts is question of law; whether facts are sufficient to establish elements of res ipsa loquitur is question of fact).

In *Stevens v. The White City,* 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932), the Supreme Court made it clear that a tug is not a bailee of a vessel in its tow. For liability to attach to the tug, plaintiff must show something more than "receipt of a tow in good order and delivery in damaged condition." *Id.* at 200, 52 S.Ct. at 349. Plaintiff must show breach of the duty to exercise "such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Id.* at 202, 52 S.Ct. at 350. In *The White City,* the vessel in tow arrived at its destination damaged, but there was no evidence to explain when, how, or where the damage occurred. *Id.* at 200, 52 S.Ct. at 349. The Supreme Court found insufficient evidence from which to conclude that the tug had been negligent. "There is nothing about the injury itself to warrant any inference that it resulted from fault or negligence." *Id.* at 203, 52 S.Ct. at 350.

This circuit has read *The White City* to allow an inference of negligence upon certain facts. In *Agri–Trans Corp. v. Peavey Co.,* 742 F.2d 1137 (8th Cir.1984), we reversed the district court's conclusion that *The White City* precluded it from raising an inference of negligence. Rather, we held that *The White City* precluded an inference of negligence only on facts which reveal "nothing about the injury itself to warrant" an inference of negligence. Given different facts than those in *The White City,* plaintiff can satisfy the burden of proving negligence with an inference. In this respect, the facts before the district court in *Agri–Trans* differed from those in *The White City.* "[T]he record contains more than the bare facts of receipt in good condition and damage on delivery." *Id.* at 1139. In *Agri–Trans,* testimony at trial established that the damage apparently resulted from collision with a large, solid, stationary object. *Id.* On this evidence— that the character of the damage suggested negligence—we held that the district court was not precluded from raising an inference, subject to rebuttal, that the tug had been negligent. Thus, plaintiff can rely on an inference when it is possible to conclude from the character of the damage sustained that "there was ... more basis for attributing the damage to some kind of incident that likely would not have oc-

curred without negligence on the defendant's part, than for attributing it to some kind of incident likely not involving negligence by the defendant." *Id.*

*The White City* and *Agri–Trans* allow an inference of negligence in admiralty without overt reliance on res ipsa loquitur. Nevertheless, the courts presume that res ipsa loquitur applies in admiralty cases. *See Johnson v. United States*, 333 U.S. 46, 48–49, 68 S.Ct. 391, 392–393, 92 L.Ed. 468 (1948) (res ipsa loquitur applied in Jones Act case involving negligence of fellow sailor); *Consolidated Grain & Barge*, 801 F.2d at 1074–75 (McMillian, J., dissenting) (arguing for application of res ipsa loquitur); *Estate of Larkins v. Farrell Lines*, 806 F.2d 510, 512–13 (4th Cir.1986) (wrongful death action under Jones Act due to disappearance of sailor at sea; res ipsa loquitur rejected on facts of case), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987); *United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1115–16 (5th Cir.1985) (res ipsa loquitur applied to explain sinking of barge). *See generally* T. Schoenbaum, *Admiralty & Maritime Law* § 4–2, at 125–26 (1987).

■ Res ipsa loquitur applies when "1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the mishap is of a type that ordinarily does not occur in the absence of negligence." *Consolidated Grain & Barge*, 801 F.2d at 1074 (McMillian, J., dissenting). Given that only Mays Towing had control of the barge between Cape Girardeau and Memphis, the first and second elements are easily satisfied. The third element, however, whether the damage is of a sort that does not ordinarily occur absent negligence, is more troublesome. Essentially, it involves the same inquiry required to raise an inference of negligence under *The White City* and *Agri–Trans:* the court

must determine that "there was … more basis for attributing the damage to some kind of incident that likely would not have occurred without negligence on the defendant's part, than for attributing it to some kind of incident likely not involving negligence." *Agri–Trans*, 742 F.2d at 1139.

On this point the district court opinion is sketchy. It does not describe the fracture in any detail, but refers to it only as "the rupture in the stern log." *Lone Star*, 725 F.Supp. at 441. The record, however, is more clear. The fracture was on the port side of the stern log, trial transcript vol. 2, at 37, approximately three feet from the corner, *id.* vol. 3, at 17, eight or ten inches above the water line. *Id.* vol. 4, at 29; vol. 6, at 151. The hull indentation containing the fracture was ten or twelve inches wide, twenty-three inches long, *id.* vol. 1, at 106, and ran vertically. *Id.* vol. 3, at 22. The fracture inside the indentation had a maximum opening of three-fourths of an inch.[3] *Id.* vol. 3, at 9, 21. At its deepest, the indentation was two and one-half inches deep. *Id.* vol. 5, at 123. One witness testified that the indentation, except for the fracture, was similar to others on the barge. *Id.* vol. 6, at 83, 99.

The district court did not make a finding as to the cause of the indentation. The record, however, suggests that it was most likely made by the corner of another boat or barge. *Id.* vol. 4, at 116; vol. 6, at 2, 101; vol. 7, at 23. It was probably not caused by the tow knee of a tug, which would not have been high enough for the necessary contact to have occurred. *Id.* vol. 4, at 117; vol. 5, at 169–70; vol. 6, at 101, 111. Thus, the record makes clear only that the indentation was likely caused by contact with another vessel.

Under either res ipsa loquitur or *Agri–Trans*, then, the critical inquiry is whether the fracture would probably not have occurred from normal or safe contact with

---

**3.** Photographs introduced at trial show both horizontal and vertical fractures. The fracture with a three-quarter inch opening ran horizontally within the vertical indentation. Lone Star's witness, Mel Drewery, a marine surveyor who examined the barge while it was still submerged, included the horizontal fracture—the

larger one—in his report, but missed the vertical one. Trial Transcript vol. 3, at 17, 22–23, 27. As indicated, the steel was separated three-fourths of an inch in the horizontal fracture. Any similar separation in the vertical fracture does not appear from the photographs.

another vessel. For an inference of negligence to apply, the fracture must be of such a character that it is more probably than not the result of negligence. *Agri–Trans*, 742 F.2d at 1139. While the district court's opinion contains only a legal conclusion that "the damage to the LS 1501 is of a type that ordinarily does not occur in the absence of negligence," *Lone Star*, 725 F.Supp. at 444, we are satisfied that the facts do not preclude an inference of negligence. Viewing the evidence in the light most favorable to the appellee, *United Barge*, 568 F.2d at 602, the record contains some evidence to support the district court's conclusion. John G. Stickling, Jr., a marine surveyor and Lone Star's expert witness, testified that in his opinion it would have taken a substantial impact to cause the fracture. Trial Transcript vol. 4, at 22. Moreover, Stickling testified that the fracture was not the result of normal wear and tear, and required contact inconsistent with safe handling of the barge. *Id.* vol. 7, at 111. Given the testimony by Mays Towing's experts to the contrary, that such an indentation could be caused by normal contact with another vessel, consistent with safe handling, and that the indentation probably cracked because the barge was old and its steel fatigued and brittle due to the ice and cold, we are not certain that we would have reached the same conclusion as the district court. We cannot, however, say that the district court's determination was clearly erroneous.

The district court went on to find that Lone Star was negligent by failing to inspect the stern compartments prior to unloading and by having only one person present during unloading. *Lone Star*, 725 F.Supp. at 444. The district court then apportioned the comparative fault of the parties at sixty percent to Mays Towing, forty percent to Lone Star. While we agree that the finding of Lone Star's negligence is well supported by the record, we disagree that the court should have apportioned fault. Rather, we think that Lone Star's negligence constitutes a superseding cause of the sinking and relieves Mays Towing of liability for the loss of the barge and its cargo.

**B. Superseding cause in admiralty**

■ Before applying the doctrine of superseding cause, however, we must consider whether its application in admiralty has survived the Supreme Court's decision in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). In *Reliable Transfer*, the Supreme Court discarded the long-standing admiralty rule of divided damages, which required the equal division of property damages whenever both parties were found guilty of contributing fault, whatever the relative degree. *See id.* at 397, 95 S.Ct. at 1708. The Supreme Court held that, whenever possible, damages should be allocated according to comparative fault. "[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault." *Id.* at 411, 95 S.Ct. at 1715.

Following *Reliable Transfer*, the Eleventh Circuit has rejected the application of superseding cause in admiralty. In *Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069 (11th Cir.1985), the Eleventh Circuit held that

[u]nder a "proportional fault" system, no justification exists for applying the doctrines of intervening negligence and last clear chance. Unless it can truly be said that one party's negligence did not in any way contribute to the loss, complete apportionment between the negligent parties, based on their respective degrees of fault, is the proper method for calculating and awarding damages in maritime cases.

*Id.* at 1075 (citation omitted). Because superseding cause presupposes that the actor's negligence is a cause in fact of the injury, W. Keeton, *Prosser & Keeton on Torts* § 44, at 301 (5th ed. 1984), it cannot be said that one party's negligence did not in any way contribute to the loss in any case in which superseding cause applies. Thus, following *Reliable Transfer*, the

Eleventh Circuit seems to have foreclosed the use of superseding cause in admiralty.

Two other circuits, while less clear, seem to presume that superseding cause still applies. In *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 463–66 (5th Cir.) (en banc), *cert. denied*, 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 63 (1984), the Fifth Circuit considered the application of superseding cause in an admiralty case involving the Wreck Act. *See* 33 U.S.C. §§ 409, 411, 412, 414, 415 (1988). In a lengthy and involved discussion about the negligence of parties causing a shipwreck and that of others failing to mark it (thereby inviting other collisions), the court, citing *Reliable Transfer*, noted that "the causal initial negligence of the upriver defendants [those causing the wreck] that contributed to the later accident would ordinarily require them to bear their apportioned share of the loss." *Nunley*, 727 F.2d at 465. The court went on to note, however, that "[p]erhaps the failure of other parties to mark the sunken wreck may in some circumstances be a superseding cause of the subsequent collision," *id.* at 465–66, and then directed the district court to consider on remand whether the negligence of the parties at fault in failing to mark the wreck constituted a "superseding cause absolving the upriver defendants of liability." *Id.* at 467. The Ninth Circuit, as well, seems to presume that superseding cause continues to apply in admiralty. *See Protectus Alpha Navigation Co. v. North Pac. Grain Growers*, 767 F.2d 1379, 1384 (9th Cir.1985) (discussion of superseding cause in dicta without reference to *Reliable Transfer*).

To the extent that *Hercules* holds that liability for negligence which is a cause in fact of injury—no matter how remote—cannot be cut off, we squarely reject it as not compelled by *Reliable Transfer*. Rather, we see no inconsistency between comparative fault and superseding cause. The application of superseding cause, whether in terms of legal cause or cause in fact, is logically antecedent to application of comparative fault. *See* T. Schoenbaum, *Admiralty & Maritime Law* § 4–8, at 139 & n. 8 (1987) ("If the court can apply the doctrine of superseding cause to apportion injuries

to separate causes based on the evidence, there is no need for the doctrine of comparative negligence."). Thus, even though an actor's negligence may be a cause in fact of injury, *Prosser & Keeton on Torts* § 44, at 301, superseding cause can still operate as a rule of law to preclude legal cause. The question of apportioning fault is not reached. *See Restatement (Second) of Torts* § 431. Simply put, *Reliable Transfer* does not deal with the determination of legal cause. *See* Note, *Last Clear Chance in Admiralty: A Divided Doctrine*, 66 Tex.L.Rev. 133, 153 (1987) ("Although *Reliable Transfer* should abrogate ameliorative doctrines, it does not mandate the elimination of causation rules."). Accordingly, we will continue to apply superseding cause in admiralty.

C. Superseding cause applied

Section 442 of the *Restatement* sets forth the factors used to determine whether negligence constitutes a superseding cause. The first, whether the intervening force "brings about harm different in kind from that which would otherwise have resulted from the actor's negligence," *Restatement (Second) of Torts* § 442(a), is the most important in this case. The record makes clear that the intervening force, Lone Star's negligence in not inspecting before unloading, brought about a harm—sinking—different in kind than would otherwise have occurred—the barge incurring a fracture in its stern log. Trial testimony established that the LS 1501 likely did not take on water en route to Memphis because the fracture was above the waterline and frozen over with ice. Trial Transcript vol. 4, at 29 (fracture eight to ten inches above waterline); *id.* vol. 6, at 150 (twelve inches above waterline); *id.* vol. 2, at 98 (ten to twelve inches of ice on stern log at Memphis); *id.* at 165 (three to four inches of ice on stern); *id.* vol. 1, at 74 (fracture above waterline during towing); *id.* vol. 5, at 103 (barge did not list en route to Memphis). Thus, the fully loaded barge sat at Lone Star's dock in Memphis for several days over the Christmas holiday without listing. *Id.* at 78, 103. The barge

sank only because it took on water during unloading when the stern became submerged and the ice covering the fracture melted, allowing water to enter the stern compartments. *Id.* vol. 4, at 145, 151. Absent Lone Star's negligence in failing to inspect prior to unloading, the barge could have sat at the dock indefinitely and would not have sunk. Kenneth Rutledge, Lone Star's terminal manager at Memphis, admitted as much:

Q: Well, Sir, if the barge hadn't of been unloaded, it wouldn't have sunk; would it?

A: Right. Yes, sir.

*Id.* vol. 2, at 168.

Second, the intervening force was not a normal result of the situation created by the negligence of Mays Towing. *See Restatement (Second) of Torts* § 442(c). That is, Lone Star's negligence in failing to inspect was an affirmative act unrelated to any negligence of Mays Towing. Rutledge testified that even though Lone Star had not been able to open the rear hatches and inspect the rear compartments, as was its normal practice, Lone Star intentionally went ahead and unloaded the LS 1501.

Q: And what you did, sir, really is, you took a calculated risk based on two things—based on the fact that the 1502 unloaded without any problems even though it was covered with ice, and you couldn't inspect, and based upon the fact that visibly it was riding level in the water. And so with those, with that criteria in mind, you and Mr. Barrett decided that you could take the calculated risk and attempt to unload the barge; isn't that what happened?

A: Yes, sir.

*Id.* vol. 2, at 166.

Given this testimony, it is clear that Lone Star's negligence was not sufficiently related to the negligence of Mays Towing to impose liability on Mays Towing. The Lone Star negligence could not have been reasonably anticipated by Mays Towing and Mays Towing was not negligent in failing to forecast such acts. *See Prosser & Keeton on Torts* § 44, at 303. Put differently, that Lone Star might unload the barge without inspection was not within the scope of the risks attributable to Mays Towing under the circumstances. *See id.* at 312 ("liability must be limited to cover only those intervening causes which lie within the scope of the foreseeable risk"). Under these circumstances, we conclude that Lone Star's negligence constitutes a superseding cause.

Our conclusion is bolstered by *Sinram v. Pennsylvania R.R.*, 61 F.2d 767 (2d Cir. 1932), in which the Second Circuit dealt with a case almost identical to that before us. On January 28, 1928, a tug operated by the railroad picked up an old barge, whose caulking had in places been reinforced, for transport to South Amboy, where the barge was to be loaded with coal. Off Bedloe's Island, the tug, according to Sinram Brothers, the barge's owner, "came alongside, struck the barge a heavy blow on her port quarter, nearly capsizing her, driving her forward against the barge ahead, and breaking some planks forward." *Id.* at 768. There was a stiff wind, it was snowing hard and it was cold. When the barge reached South Amboy, the owner, when told of the collision, tried to determine whether the barge had sustained any damage, but "her outside was covered with ice and he could find nothing." *Id.* The barge then sat at the dock from the morning of January 29 until February 2, when it was loaded with 454 tons of coal. On February 4, the barge sank.

The district court awarded full damages to the owner and to the intervenor-insurer. In an opinion by Judge Learned Hand, the Second Circuit reversed. The court began by concluding that the owner had been negligent in loading the barge with coal without a proper inspection. "It does not appear that he went below to learn what he could by looking inside." *Id.* at 769. Nor was the weather any excuse. "[I]f the weather prevented him from properly examining her, he should certainly have objected to loading her until he could, for she was not safe if her seams were open." *Id.* This proof of negligence by the barge owner, the court held, "exonerated [the tug] from all damages to the barge after the

collision." *Id.* Thus, the court held the tug liable only for collision damage.

The court also considered whether the tug was independently liable to the insurer: "whether the tug's careless approach to the barge was itself the breach of some duty to the underwriter, since she knew that it was going for a cargo of coal." *Id.* at 771. Using a test of "whether the damage could be foreseen by the actor when he acted," *id.*, the court found no liability.

> [I]t appears to us that the [tug], in approaching the barge at too great speed, or at the wrong angle, need not have considered the possibility that if he struck her, she might be injured, that her bargee might be so slack in his care of her as to let her be loaded without examination, and might so expose her to the danger of sinking. In the end this may seem merely a fiat, but that is always true, whatever the disguise.

*Id.* Because of the negligence of the barge owner in failing to properly inspect the barge before loading, the tug was liable only for the damages caused by the collision. *See also The Mars*, 9 F.2d 183, 184 (S.D.N.Y.1914) (Hand, J.) (barge damaged by collision with tug but damage above waterline; barge later sank after being loaded without inspection; tug held liable only for collision damage to barge because "the subsequent damages are due to an independent act of negligence, which supervenes in time.").

We cannot distinguish this case from *Sinram*. The LS 1501 was an old barge, near or at the end of its useful life, making a voyage in snow and ice. On far less certain evidence than in *Sinram*, it was damaged by the negligence of the tug. The damage caused by the tug's negligence, however, was a crack in the hull, not the loss of the barge or its cargo. As in *Sinram*, the barge sank only after its owner failed to properly inspect it before submerging the crack underwater.[4] As in *Sinram*, this negligence constitutes a superseding cause.

## III. CONCLUSION

In *In re Kinsman Transit Co.*, 338 F.2d 708, 722 (2d Cir.1964), *cert. denied*, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965), in which the court distinguished *Sinram*, Judge Friendly noted that *Sinram* illustrated the proposition "that there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first." Put another way, the problem in this case, as in any case involving an intervening cause, involves questions about "imposing legal responsibility." *Prosser & Keeton on Torts* § 44, at 301. Even though the district court found that Mays Towing was in some way negligent, the negligence of Lone Star was such that it relieves Mays Towing of liability for loss of the barge and its cargo. The judgment of the district court is reversed and remanded for modification of the judgment consistent with this opinion.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent. The court today simply avoids our direction from the Supreme Court in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 410–11, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975), that liability for damage "is to be allocated among the parties proportionately to the comparative degree of their fault." *Id.* at 411, 95 S.Ct. at 1715. The court today accepts the finding that Mays Towing was in some way negligent, as was Lone Star, but nonetheless concludes that Lone Star's negligence relieves Mays of liability for the loss.

The court rejects the holdings of the Fifth Circuit en banc in *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464–66 (5th Cir.) (en banc), *cert. denied*, 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 63

---

4. The only apparent distinction between the cases is that because Sinram Brothers was directly told that the tug had collided with its barge, its duty to inspect for damage was arguably clearer. The district court found that Lone Star was negligent in failing to inspect, however, and its finding is well supported. Thus, any distinction on these grounds makes no difference.

(1984), and the Eleventh Circuit in *Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069, 1075 (11th Cir.1985), refusing to apply intervening negligence or superseding cause under the teaching of *Reliable Transfer*. Instead, it elects to follow dictum from a decision of the Ninth Circuit in *Protectus Alpha Navigation Co. v. North Pacific Grain Growers*, 767 F.2d 1379, 1384 (9th Cir.1985), and errs in doing so. Although the opinions of Judge Learned Hand always have strong persuasive impact, the Second Circuit decided *Sinram v. Pennsylvania Railroad Co.*, 61 F.2d 767 (2d Cir.1932), 43 years before the Supreme Court issued *Reliable Transfer*.

Even assuming that the court's interpretations of *Reliable Transfer, Nunley*, and *Protectus Alpha Navigation Co.* are correct, the court's opinion contains a far more serious flaw. To reach its conclusion, the court must hold that the district court's finding that Mays' negligence proximately caused the damage is clearly erroneous, or hold as a matter of law that Lone Star's negligence was a superseding cause that cut off the liability of Mays Towing. The court simply fails to take either of these steps.

The question of whether one party's negligence constitutes a superseding cause of the injury is a question of fact. W. Keeton, *Prosser & Keeton on Torts* § 45 at 320 (5th ed. 1984). Discussing the functions of the court and jury in determining particular elements in the proximate cause inquiry, Keeton writes:

> Even though this evaluative determination is not a factfinding in the usual what-happened sense, it is nevertheless a question that is to be decided by a jury to the same extent, no more and no less, as fact questions are to be decided by a jury. Thus, if reasonable persons could not differ about the determination on the evidence before the court, it is decided by the trial judge, or by the appellate court. If, on the other hand, reasonable persons could differ, then the trial judge must explain the applicable legal concept to the jury, and leave to the jury the responsibility of making the evaluative determination—the application of that concept to the facts, as they find them to be. *Id.*

In this admiralty case the district court was the factfinder, but the principles above direct the analysis of this issue. A finding of superseding cause serves to cut off the liability of the party whose antecedent negligence constitutes a cause-in-fact of the injury but whose actions are no longer considered the legal or proximate cause of injury. *See* Keeton, § 44 at 301; *see also* maj. op. at 1459. By concluding that Lone Star's negligence constituted a superseding cause of the injury, this court simply engages in its own factfinding and overturns the district court's findings on proximate cause without concluding that those findings are clearly erroneous. *See Valley Line Co. v. Ryan*, 771 F.2d 366, 372 (8th Cir.1985) (district court's findings in admiralty will not be disturbed unless clearly erroneous); *Wilkins v. P.M.B. Systems Engineering, Inc.*, 741 F.2d 795, 800 (5th Cir.1984) (questions of negligence and causation in admiralty are questions of fact); *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1184 (5th Cir. 1984) (findings of negligence and proximate cause in admiralty reviewed under clearly erroneous standard).

The district court found that both Lone Star and Mays Towing proximately caused the injury to the barge. The majority opinion flouts the rules of appellate review by rejecting the district court's findings, *see* maj. op. at 1459, without concluding that those findings are clearly erroneous.

As this court failed to make a necessary conclusion—that the district court's findings on proximate cause are clearly erroneous or that the negligence of Lone Star constituted a superseding cause of the injury as a matter of law—to support its holding, we should affirm the order of the district court.