# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-31046

PLAINS PIPELINE, L.P.; PHILLIPS 66 PIPELINE, L.L.C.,

Plaintiffs - Appellants

v.

GREAT LAKES DREDGE & DOCK COMPANY; GREAT LAKES DREDGE
& DOCK COMPANY, L.L.C. OF LOUISIANA,

Defendants - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

August 12, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CV-398

Before STEWART, Chief Judge, and JOLLY and GRAVES, Circuit Judges.
PER CURIAM:*

This interlocutory admiralty appeal involves an allision between a dredge owned and operated by Great Lakes Dredge & Dock Company, LLC, and an underwater oil pipeline owned by Plains Pipeline, L.P., and used by Phillips66 Pipeline, LLC. The alleged allision occurred in the early morning of March 17, 2012, when the dredge, seeking to secure its position for anchoring,

---

* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 14-31046

lowered its dredge ladder and cutter head[1] into the seabed, striking the pipeline.   Following the allision, Plains and Phillips sued Great Lakes, claiming, among other things, that Great Lakes acted negligently in failing to discharge its notification responsibilities under the Louisiana Underground Utilities and Facilities Protection Law, La. Rev. Stat. Ann. § 40:1749.11 *et seq.* (referred to as "the One-Call Statute"), before engaging in the anchoring procedure.

At issue in this appeal are the district court's orders with respect to two motions for partial summary judgment.  In July 2014, Great Lakes moved for partial summary judgment on Phillips's claims seeking recovery for "economic loss," asserting that Phillips lacked a proprietary interest in the pipeline and thus that its claims were barred under the rule set out by the Supreme Court in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1927).  On the same day, the plaintiffs moved for partial summary judgment, seeking a ruling that Great Lakes had engaged in "excavation" the morning of the incident and therefore was required to provide advance notice under the One-Call Statute. *See* La. Rev. Stat. Ann. § 40:179.12(6).  The district court granted Great Lakes's motion and denied the plaintiffs' motion.  Reviewing these decisions de novo, *see, e.g., Alexander v. Express Energy Servs. Operating, L.P.,* 784 F.3d 1032, 1033 (5th Cir. 2015), we AFFIRM.

I.

We begin with the district court's determination that Great Lakes's conduct on the morning of the incident did not subject it to the One-Call Statute.

---

[1] Although the cutter head is ordinarily a dredging tool, it is undisputed that, at the time of the incident, the cutter head was being used, not to dredge, but to bring the vessel to a stop and secure its position for anchoring.  *See also infra* pp. 4–5.

No. 14-31046

A.

Under the One-Call Statute, persons planning to "excavate" near an underground utility or facility must first give at least 48 hours' notice to the appropriate regional notification center. La Rev. Stat. Ann. §§ 40:1749.13(A)– (B). Once notice of excavation is given, the notification center, in turn, notifies the owners and operators of nearby underground facilities, *id.* § 1749.14(B), who then must mark the location of their facilities on the surface (or otherwise inform the excavator of their facilities' locations) before excavation begins. *Id.* § 1749.14(C). The purpose of this process is "to promote the protection of property" and persons "in the immediate vicinity of an underground facility . . . from damage, death, or injury." *Id.* § 1749.11(B). Accordingly, excavators who fail to give the requisite notice are subject to civil penalties enforced by the Louisiana Department of Public Safety and Corrections (the Department) or by local law enforcement. *Id.* § 1749.23.[2]

Because it is "excavation" that triggers the notification requirement, the critical question is whether Great Lakes's anchoring procedure constitutes "excavation."[3] The statute defines "excavation" as follows:

---

[2] The Department fined Great Lakes $3,000 for the events at issue here. Great Lakes, expressing its view that the One-Call Statute did not apply, pleaded *nolo contendere* and paid the fine.

[3] The plaintiffs vigorously dispute this characterization of Great Lakes's activity, asserting that the dredge's use of the cutter head amounted to "much more than 'anchor[ing].'" For support, they direct us to (1) statements from Great Lakes's site manager to the Department investigator that the dredge was still moving at the time the cutter head penetrated the seabed, such that the cutter head itself is what stopped the dredge; and (2) a hydrographic survey of the pipeline area showing that the cutter head created a "scour area" several feet deeper than the one later created by the dredge's permanent anchors.

Even viewed in the light most favorable to the plaintiffs, however, this evidence is insufficient to remove Great Lakes's activity from the realm of "anchoring." For one thing, the plaintiffs have given no reason to think that a vessel must be at a complete stop for one to "anchor" it, and no such requirement seems inherent in the ordinary meaning of the word "anchor." *See Oxford English Dictionary* (online ed. 2015) (defining the verb "anchor" as "[t]o secure (the ship) with an anchor; to place at, or bring to, anchor"). Furthermore, although

3

No. 14-31046

"Excavation" or "excavate" means any operation for the purpose of movement or removal of earth, rock, or other materials in or on the ground by the use of powered or mechanical or manual means, including pile driving, digging, blasting, auguring, boring, back filling, dredging, compressing, plowing-in, trenching, ditching, tunneling, land-leveling, grading, and mechanical probing. "Excavation" or "excavate" shall not include manual probing.

§ 1749.12(6). The Louisiana Supreme Court has never interpreted the One-Call Statute's definition of "excavation." Our task, then, is to "make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case." *Six Flags Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009).

B.

We think it clear that anchoring does not fall within the statutory definition of "excavation." As an initial matter, the plaintiffs concede that none of the explicitly listed examples of "excavation" is implicated here. *See* § 1749.12(6) (listing as examples of "excavation" "pile driving, digging, blasting," etc.). They argue, however, that Great Lakes's anchoring activity was an "operation for the purpose of movement . . . of earth," and thus constitutes "excavation" under § 1749.12(6)'s general definition of the term. Specifically, they argue that Great Lakes's activity had "the purpose of" moving earth because, "to accomplish" the objective of stopping the movement of the

---

the cutter head may indeed have penetrated deeper into the seabed than did the dredge's permanent anchors, this fact suggests a difference only in degree, not in kind.

More to the point than the evidence relied on by the plaintiffs, we think, is the deposition testimony from witnesses who were present at the time of the incident and who are familiar with the dredge's cutter-head technique. Those witnesses uniformly testified that (1) when a dredge uses the cutter head as part of its anchoring process, it does so in order to maintain position after coming nearly to a complete stop; and (2) the cutter-head technique is necessary for the dredge to anchor in anything other than perfect weather and current conditions. In the light of this undisputed testimony, we agree with the district court that the dredge's use of the cutter head on the morning of the incident is properly characterized as "anchoring."

dredge, "the cutter head would have to dig into the seabed and displace the earth."

This argument fails to persuade, however, because it overlooks the basic legal distinction between purpose and knowledge. *See generally* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 1(a) & cmt. a (2011). Again, under § 1749.12(6), an activity constitutes "excavation" if it has "the *purpose* of movement . . . of earth." § 1749.12(6) (emphasis added). Persons have the "purpose" of causing a particular result only if that is their "conscious object." Model Penal Code § 2.02(2)(a)(i); *see also Black's Law Dictionary* (10th ed. 2014) (defining "purpose" as "[a]n objective, goal, or end"). By contrast, persons act "knowingly" with respect to a result if they are "practically certain" the result will follow from their conduct. Model Penal Code § 2.02(2)(b)(ii); *see also Black's Law Dictionary* (10th ed. 2014) (defining "knowledge" as "a state of mind in which a person has no substantial doubt about the existence of a fact"). The plaintiffs may well be right that the movement of earth is an inevitable result of anchoring, and thus that a person who engages in anchoring does so *knowing* that he will cause the movement of earth. But under the One-Call Statute, an activity constitutes "excavation" only if the "purpose"—the actual object—of engaging in it is the "movement . . . of earth." § 1749.12(6). And the object of "anchoring" is, unmistakably, the securing of a ship, not the movement of earth.[4]

---

[4] The Louisiana Supreme Court has recognized this distinction between "purpose" and "knowledge" in other contexts. *See, e.g., Bazley v. Tortorich*, 397 So. 2d 475, 481–82 (La. 1981) (holding that a person acts "intentionally" for the purposes of the intentional-tort exception to Louisiana's worker's-compensation law if "the person . . . *either* (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; *or* (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result" and explaining that these two prongs are disjunctive (emphasis added) (citing Restatement (Second) of Torts § 8 (1965)). Given the distinction's ubiquity, the Louisiana legislature's express choice of the word "purpose" in

No. 14-31046

This plain-language reading of § 1749.12(6)'s "purpose" requirement accords with the statutory context. Under "the commonsense canon of *noscitur a sociis*[,] a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *see, e.g., State v. Jones*, 2007-1052 (La. 6/3/08); 983 So. 2d 95, 105 ("Because the word [at issue] is accompanied by . . . specific words . . . , all of which are capable of analogous meaning, the principle of *noscitur a sociis* is appropriately invoked in determining the scope of this statutory proscription."). Here, the "neighboring words" of § 1749.12(6)'s general definition of "excavation" confirm that in the general definition, "purpose" means purpose. First, each of the examples explicitly listed as an "excavation" activity is an activity in which the movement of earth is the *object*, not just a side effect. *See* § 1749.12(6) ("'Excavation' . . . includ[es] pile driving, digging, blasting, auguring, boring, back filling, dredging, compressing, plowing-in, trenching, ditching, tunneling, land-leveling, grading, and mechanical probing."). Similarly, the word "excavation" itself connotes an activity that not only incidentally results in the movement of earth, but is actually *aimed at* it: this is why no one would say, for instance, that raking leaves constitutes "excavation." *See, e.g., Oxford English Dictionary* (online ed. 2015) (defining "excavate" as "[t]o make hollow by removing the inside" or "to dig out (soil) leaving a hollow"). Thus, the *noscitur* canon confirms what plain language indicates: an activity falls into § 1749.12(6)'s general definition of "excavation" only if—unlike anchoring—its actual goal is the movement of earth.

Finally, we note that, even if there were ambiguity in the statute's "purpose" requirement, our interpretation would not change. Under the rule

---

§ 1749.12(6), and the other interpretive canons discussed *infra* pp. 6–7, our *Erie* guess is that the Louisiana Supreme Court would recognize the distinction here also.

No. 14-31046

of lenity, Louisiana courts resolve ambiguities in "penal" statutes (such as this one) in the defendant's favor. *See, e.g., Gibbs Constr. Co. v. Dep't of Labor*, 540 So. 2d 268, 269 (La. 1989). Thus, assuming *arguendo* that § 1749.12(6) *could* be stretched to include activities in which the movement of earth is only a substantially certain result, the rule of lenity would nonetheless require us to adopt the narrow reading of "purpose" set out above.

\*     \*     \*

In sum, § 1749.12(6), in relevant part, defines "excavation" to mean "any operation for the purpose of movement . . . of earth." Because the purpose of Great Lakes's activity here—anchoring—is not the movement of earth, the district court did not err in concluding that the One-Call Statute was not triggered.

## II.

We turn next to the district court's determination that Phillips's claims for economic damages were barred by the *Robins Dry Dock* rule.

## A.

Under the well settled rule set out by the Supreme Court in *Robins Dry Dock*, a plaintiff may not recover in an unintentional maritime tort suit "for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest." *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1022 (5th Cir. 1985) (en banc). The purpose of the *Robins Dry Dock* rule, we have said, is to serve as a "pragmatic limitation on the doctrine of foreseeability," giving judges an easily administrable rule of decision and allowing parties to order their affairs in view of predictable outcomes. *Id.* at 1022, 1028–30. Accordingly, this court has enforced *Robins Dry Dock*—and in particular, its requirement that the plaintiff have a "proprietary interest" in the damaged property—as a "bright line," "hard-edged" rule. *See State of Veracruz v. B.P., P.L.C. (In re Deepwater Horizon)*, 784 F.3d 1019, 1023 (5th

No. 14-31046

Cir. 2015); *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1194 (5th Cir. 1993). In particular, this court has held that a plaintiff has a sufficient "proprietary interest" to recover under *Robins Dry Dock* only if he is the actual owner of the physically damaged property or one who is "tantamount" to an owner, *Veracruz*, 784 F.3d at 1026 (internal quotation marks omitted); that is, only if he has "taken over the property at issue 'lock, stock and barrel.'" *Id.* at 1031 (quoting *Louisville & N.R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469, 473 n.3 (5th Cir. 1979) (Wisdom, J.)); *see also Texas E. Transmission Corp. v. McMoran Offshore Exploration Co.*, 877 F.2d 1214, 1225 (5th Cir. 1989) (identifying as incidents of ownership "actual possession or control, responsibility for repair, and responsibility for maintenance").

B.

Citing *Robins Dry Dock*, Great Lakes argues that Phillips cannot recover some of its claimed damages (specifically, the costs it incurred in transporting its oil by alternative means during the period following the allision). According to Great Lakes, those costs represent economic losses resulting from physical damage to the pipeline—property in which Phillips lacks a "proprietary interest" because the pipeline is owned by Plains, not Phillips. For its part, Phillips does not dispute that these costs represent economic losses, nor does it contend that it is the actual owner of the pipeline. Instead, it argues that the contractual relationship between it and Plains—a relationship governed by two contracts, a Service Agreement and an Operating Agreement—gives it a sufficient "proprietary interest" in the Pipeline to recover its economic losses even under *Robins Dry Dock*. This is so, Phillips says, because the Service Agreement gives Phillips exclusive use of the full capacity of the Pipeline, and because the Operating Agreement makes Phillips "almost totally responsible for all of the expense associated with the ownership of the pipeline including insurance and taxes."

8

No. 14-31046

In our view, however, the district court did not err in concluding that *Robins Dry Dock* barred Phillips's recovery on its economic-loss claims. Even if Phillips indeed does have exclusive use of the full capacity of the pipeline, exclusive use, standing alone, does not create a "proprietary interest" within the meaning of *Robins Dry Dock*. *See Veracruz*, 784 F.3d at 1026. Instead, as noted, the plaintiff must have "complete control" over the property—control "tantamount to full ownership." *Id.* (internal quotation marks omitted). Here, the Service and Operating Agreements show that Plains retained significant control over and responsibility for the pipeline, such that "[i]t could not be said that [Phillips] ha[s] taken over the [pipeline] 'lock, stock and barrel.'" *Id.* (quoting *Bayou Lacombe*, 597 F.2d at 473 n.3).

For one thing, under the agreements, Plains maintained the right as owner to sell all or substantially all assets of the pipeline. Furthermore, Plains retained the responsibility to "manage, operate, . . . maintain," and "repair" the pipeline using its own employees, as well as to obtain insurance for and pay taxes on the pipeline. Finally, Plains paid all pipeline-related costs in the first instance, and was obligated to pay maintenance-and-repair costs *without reimbursement* by Phillips to the extent that those costs, when combined with other contractually defined "Fixed Costs," exceeded $2.6 million annually.[5] For Phillips to have a "proprietary interest" in the pipeline sufficient to withstand the *Robins Dry Dock* rule, the interest left in Plains must amount to nothing more than "a right of reversion." *Bayou Lacombe*, 597 F.2d at 473–74. As the

---

[5] The plaintiffs argue that maintenance-and-repair costs are not "Fixed Costs" subject to the $2.6 million cap. This argument, however, is inconsistent with the Operating Agreement, under which "Fixed Costs" is the "catchall" category that includes "[a]ll amounts paid . . . for the provision of . . . services described in" the Operating Agreement that are not defined as "Direct Costs." Because Plains's maintenance-and-repair obligations are plainly "services described in" the Operating Agreement, and because maintenance-and-repair costs are not defined as "Direct Costs," maintenance-and-repair costs are "Fixed Costs" by virtue of the catchall clause.

No. 14-31046

district court rightly concluded, Plains's retained interest in the pipeline under the Service and Operating Agreements was much more than that.

\* \* \*

Because Phillips lacked a sufficient "proprietary interest" in the pipeline under this court's *Robins Dry Dock* jurisprudence, the district court did not err in dismissing Phillips's claims for economic damages.

AFFIRMED.